[Crim. No. 21532. Aug. 23, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY JAMES ALCALA, Defendant and Appellant.

[Crim. No. 23258. Aug. 23, 1984.]

In re RODNEY JAMES ALCALA on Habeas Corpus.

608

**COUNSEL**

Keith C. Monroe, under appointment by the Supreme Court, David A. Zimmerman and Monroe & Riddet for Defendant and Appellant and Petitioner.

Quin Denvir, State Public Defender, Michael G. Millman and Joseph Levine, Deputy State Public Defenders, Samuel R. Gross and Robert C. Vanderet as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington, Harley D. Mayfield, Patricia D. Benke, Bruce Daniel Rosen and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

Edwin L. Miller, Jr., District Attorney (San Diego), Richard D. Huffman, Chief Deputy District Attorney, and Paul M. Morley, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—Defendant Rodney James Alcala was convicted on one count of first degree murder (Pen. Code, §§ 187-189) with use of a deadly weapon

(*id.*, § 12022, subd. (b)) and one count of forcible kidnaping (*id.*, § 207). (All statutory references are to the Penal Code unless otherwise indicated.) Defendant admitted a prior conviction and prison sentence for lewd and lascivious conduct upon a child under 14. (§§ 288, 667 et seq.) Under the 1978 death penalty law, a special circumstance that the murder occurred in the course of a kidnaping (§ 190.2, subd. (a)(17)(ii)) was found true, and defendant was sentenced to death. This appeal is automatic. Defendant has also filed a related petition for habeas corpus.

We will conclude that the convictions and special circumstance finding must be reversed, since the admission of prior offenses constituted prejudicial error on those issues. However, we will reject defendant's contention that the double jeopardy clause bars retrial of certain allegations because the valid evidence at the first trial was legally insufficient to support them. We will also hold that defendant may be retried on all counts of the current information regardless of asserted irregularities at his preliminary hearing.

### INVESTIGATION

On the afternoon of June 20, 1979, 12-year-old Robin Samsoe left the Huntington Beach apartment of her friend Bridgett Wilvert to bicycle to a ballet lesson. On July 2, William Poepke, a member of a forest service spraying crew, came upon Robin's scattered remains in a remote mountain ravine above Sierra Madre. The skull was separated from the neck, and the lower teeth were fractured in a manner consistent with a blow from a hard object. The left foot and portions of the hands were missing.

A "Kane Kut" kitchen knife was found nearby. It bore a minute drop of human blood, type unknown. A beach towel discovered in the vicinity contained "wipe" stains of type A blood. Type A blood was mixed with rocks and leaves in the area.[1] No clothing was found except for one tennis shoe which bore the name Robin. Because of the advanced state of decomposition, it was impossible to determine medically the time and cause of death, or whether Robin had been sexually molested.

The police learned that, shortly before Robin's disappearance, she and Bridgett had been accosted at the beach by a strange man. With their permission, the stranger had taken several pictures of the two girls, including a carefully posed photograph of Robin. He walked or ran away quickly when Jackye Young, an adult acquaintance of Bridgett's, approached. Young and Bridgett helped the police prepare a composite sketch of the photographer. Defendant's former probation officer recognized the drawing.

---

[1] Robin's blood type was apparently type A.

Based on defendant's record as a child molester, his known penchant for prurient photography of children, and indications that he frequented the area where Robin's body was found, the police obtained a warrant to arrest defendant and search his home and car. On July 24, defendant was arrested in his bedroom in Monterey Park, and the residential search was carried out. A receipt for a Seattle storage locker was found; the receipt was dated after Robin's death. There was a Kane Kut knife set in the house, which defendant shared with his mother, but no knife was missing from the set.

The Seattle storage locker was later searched under warrant. Police discovered cold-weather clothing and kitchenware, quantities of photographs and film, and a pair of gold-coated earrings.

## GUILT TRIAL

### A. People's case.

Toni Esparza, then 15, and Joanne Murchland, then 14, testified they were at Huntington Beach on June 19, 1979. A man they both identified as defendant asked to take their pictures for a "bikini photo contest." He also offered them a ride and marijuana, and he tried to get their phone numbers. They contacted police when they saw defendant's picture on television news.

Lorrie Werts, 15, told of a similar experience with defendant at the beach on June 20. Police had found her photo in the Seattle storage locker. Her narrative was confirmed in large part by her companion, Patty Elmendorf. Several other people testified to seeing defendant at the beach in early to mid-afternoon on the 20th, though details of clothing and appearance varied.

In court, Bridgett Wilvert positively identified defendant as the photographer she and Robin had met at the beach on June 20 between 2 and 3 p.m. Jackye Young confirmed that identification.

According to Bridgett, she and Robin returned to Bridgett's apartment about 3:10. Robin said she had to hurry to a 4 p.m. ballet lesson; she was excited because she was "moving up to toe." Bridgett offered Robin her bike, a yellow Schwinn 24-inch model with turned-up handlebars, which was in the laundry room of the apartment building. Robin left dressed lightly in a red T-shirt, shorts, and tennis shoes. The bike has been missing since.

Marianne Frazer, Robin's mother, and Beverly Fleming, who owned a children's dance studio in Huntington Beach, confirmed that Robin was due but never arrived at a 5 p.m. dance class. She had taken ballet and gym-

nastics since she was four and was serious about her dancing. After her mother's recent accident, Robin had arranged to answer phones at the studio to pay for her classes. Both Bridgett and Fleming said Robin would never miss a class from disinterest.

Dana Crappa, a forest service worker, presented key evidence. She was a member of the spraying crew which had discovered Robin's body on July 2. She had been uncooperative in police interviews and evasive at the preliminary hearing. Much of what she said at trial was new, and she displayed great distress on the witness stand.

Crappa had previously admitted a near-collision with a distinctive Datsun like defendant's on the evening of June 21. The Datsun was parked at Rendezvous Turnout, less than a mile from the crime scene. Beside the car was a man wearing levis and a stained T-shirt. The car appeared to have dirt kicked up under the tires.

Crappa confirmed that information, but now revealed under persistent questioning that she had seen the same Datsun on the previous evening, June 20, between 5 and 5:30 p.m. The June 20 encounter took place at "Marker 11," a turnout less than 300 feet from where Robin's body was found. Crappa said two people with their backs to her, a man and a small girl with long blonde hair, were walking up the ravine away from the road. The man, wearing levis and a T-shirt, was "sort of forcefully steering" the girl up the gully. Crappa could not see whether he was touching her or holding a weapon. The man turned and looked "straight through" Crappa, who thought something might be wrong but continued on.

Crappa had testified at the preliminary hearing that the June 21 encounter occurred between 10 and 10:30 p.m. Having since retraced her activities for that day, she now thought it was more like 8 to 8:30.[2] In court, Crappa declared she was almost certain, but not "100 percent positive," that defendant was the man she had seen on both occasions.

Crappa further testified for the first time that she returned to Marker 11 between 7 and 7:30 on the evening of June 25 and walked up the ravine with a flashlight. With extreme difficulty, the prosecutor elicited that she had discovered a body. Part of the face was gone, and the corpse, apparently unclothed, was "pretty cut up." The hands and feet were missing, but Crappa could not say whether they had been cut off and could not "remember" whether the legs were hacked up. The head was "next to" the body, and

---

[2]The timing is significant, since the defense presented evidence that defendant spoke by telephone to his girlfriend, Beth Kelleher, from his home around 10 p.m. on the 21st.

she could not tell if it was severed. Nearby she saw a blue and yellow tennis shoe and what looked like shorts and a T-shirt. She found no knife. There were tire tracks in the area. Horrified, she left quickly and told no one.

Four days later, Crappa recounted, she was part of a spraying crew which included William Poepke. Poepke came upon a pile of bones in the same area. Thinking the remains were those of a deer, he picked up a bone and tossed it at her. She knew it was no deer.

That night, said Crappa, she visited the scene again. It was dark, but, closer to the roadway, her flashlight beam caught a shiny object. She could not say for sure that it was a knife but believed now that it was. She saw the body, "drawn out" and skeletal by then, the right arm missing. She found some blonde hair. The shorts, T-shirt, and tennis shoe were still there. Three days later Poepke discovered the skull, and the authorities were called.

Marianne Frazer, Robin's mother, confirmed that the earrings recovered from defendant's Seattle storage locker looked like a pair Robin may have borrowed from her. Frazer explained that after a "dangle" was lost from one of the pair, she pinched off the other dangle with nail clippers so the earrings would match. Robin sometimes borrowed them, and they had been missing since her disappearance. According to Frazer, the recovered earrings closely resembled her pair after the dangles had been removed, and a blemish on one of the earrings looked like the pinch mark left by her clippers. Laboratory tests to discover whether Frazer's clippers caused the blemish were inconclusive.

Two Orange County jail inmates appeared as prosecution witnesses. Robert Dove testified he overheard a conversation between defendant and another inmate, Michael Herrera. According to Dove, defendant denied stabbing Robin, saying he had only "slapped her unconscious."

Later, defendant told Dove himself that "nobody seen me take her." They would never convict him, said defendant, without the "film" and the "bike," and they would not find the bike. In a conversation about photography, defendant said vaguely that he liked to go to a place in the mountains near water towers where one could see city lights. He also mentioned Big Tujunga Canyon. (The death scene was in Santa Anita Canyon, not Big Tujunga, but it was fairly near water towers, and city lights were visible from the road nearby.) Defendant said the victim's friend—apparently Bridgett Wilvert—had been unable to identify him "even under hypnosis."

Herrera testified that defendant said he had seen a lawyer who thought the case was weak because "it's no crime to take pictures at the beach,"

and there was no positive identification anyway. Defendant said he had gotten Robin into his car by offering to pay her for magazine photos, which wouldn't take long.[3] In any event, he told her he would drop her at her appointment. He had trouble getting the bicycle into the car. Once underway, he locked Robin's door. Defendant was evasive about the route he took, but talked about the Pacific Coast Highway and said "the scenery was nice." Herrera indicated that he "thinks" Robin was "worried, scared" and "wanted to get out of the car."

At some point, according to Herrera, defendant asked her if she had ever posed nude. She was crying, and defendant started "slapping the shit out of her"; it was a "weird situation" and "a trip." Robin became "unconscious," and defendant thought about taking her to "some mountains"; Herrera remembered the name San Gabriel. Defendant finally decided to leave her where she was. Later he abandoned the bike behind a "Thrifty Drug Store or Thriftimart or some kind of thrift store," and he believed the police would not find it. As in Dove's version, defendant denied shooting or stabbing Robin.

The missing bicycle was never found. However, the manager of a charity thrift store in El Monte testified he had found a yellow Schwinn bicycle with turned-up handlebars behind the store during July and sold it. The bike was in unusually good condition for a charity donation.

Over defendant's strenuous objection, evidence of his conduct on prior occasions was introduced. It tended to show that defendant had a history of enticing young girls into his car, taking them to isolated places, and subjecting them to forced sexual activity and violence. This evidence is discussed in greater detail below.

A deputy coroner testified that Robin's remains had been chewed by animals, which accounted for much of their scattered and mutilated state when found on July 2. However, a forensic dentist opined that chips in the lower teeth were very likely produced by forceful contact with a blunt object, whether before or after death.

At the conclusion of the prosecution's case, defendant moved for acquittal. (§ 1118.1.) The motion was denied, except that an allegation of child molestation as a special circumstance was stricken from the information.

---

[3]Beverly Fleming, the dance studio operator, had testified that Robin wanted to be a movie star or a model so her mother would not have to work so hard.

*B. Defense case.*

Tim Fallen testified that on June 21, the day after Robin disappeared, he saw her riding a yellow bicycle in Huntington Beach only 20 minutes before a policeman showed him her picture. Fallen was sure she was wearing a white T-shirt, though all other witnesses said she was last seen in a red one. When asked to compare Robin's photo with that of another blonde girl, he identified them as the same person.

The defense sought to cast suspicion on one Raul Vasquez. Vasquez and Sierra Madre Police Officer Gerald Crawford each described his encounter at the Marker 11 turnout at 11:15 on the night of June 22. According to Crawford, Vasquez was walking toward the road from the ravine. Crawford asked what he was doing, and Vasquez replied that he was relieving himself and waiting for his girlfriend. Vasquez did not give his name when asked. Crawford patted him down and found a heavy wrench in his back pocket.

In Crawford's opinion, Vasquez seemed "shaky," "nervous," and "upset," as though "he didn't want me to locate someone or something, either inside his car or in the area." The left rear passenger window of Vasquez' car was broken out, and a large brown beach towel covered the back seat. There was broken glass on the rear seat floor and a six-pack of Budweiser on the front floorboard. Crawford conceded that the turnout is often used for drinking and illegal drug activities.

The prosecution produced a rebuttal witness, Robert Rose, the owner of a body shop where Vasquez was employed in June 1979. According to Rose, Vasquez' time card showed he had worked full days on June 20 through June 22, always leaving after 5 p.m.

The defense presented several alibi witnesses. Christine De La Cerda, defendant's sister, stated that she saw him at her home near Montebello at 4:30 p.m. on June 20. Marie Troiano, another sister, testified that defendant called her collect at her Fremont home at 5:54 p.m. on June 20. Her bill reflects that a call was made to her number from the Monterey Park house at that time.

Elizabeth Kelleher, defendant's former girlfriend, stated that defendant made a one-minute call to her home at 9:15 p.m. on the 21st, leaving a message. That call appears on the bill for defendant's residence. At 10:08 she called him back, speaking 19 minutes.

Defendant's mother, with whom he shared the Monterey Park residence, denied making either the Fremont call or the one to Beth Kelleher. She

admitted that many of the Fremont calls on her bill were hers, and that she had spoken by phone with Beth Kelleher on a number of occasions since defendant's arrest. She also conceded that her daughter Christine often used her phone.

David Carpenter, a defense investigator, testified he drove from Marker 11 to the Monterey Park residence by way of the El Monte thrift store. On counsel's instructions, he left Marker 11 at 5:15 on a Thursday afternoon, used the most logical route, and drove at the speed limit. He arrived about 5:58.[4]

Next, the defense concentrated on discrediting Dana Crappa. William Poepke testified that, just after their first payday as firefighters, he cooked a pizza dinner for Crappa "from [their] first paycheck." She mentioned she had just had a near-accident at Rendezvous Turnout. They received their first checks on June 13 or 14, and June 21 was in the middle of a pay period. She never mentioned another accident, and they both agreed that the incident must have occurred during the first two weeks of June.

Under intense cross-examination, Crappa had testified that her extreme reluctance to come forward with her evidence was caused by overwhelming feelings of horror, guilt, denial, and depression. She had described recurring nightmares about the things she had seen. The nightmares were never quite identical in all details, she said, giving rise to some concern that they had confused her actual memory. She wanted to be completely certain of her facts before she revealed them to the authorities.[5]

The defense now sought to show that much of Crappa's testimony was confabulated, a product of improper police interrogation methods which played upon Crappa's confusion and emotional turmoil.[6] Tapes were introduced of extensive interviews conducted separately with Crappa by Detectives Droz and Robison. Defense and prosecution experts gave conflicting

---

[4]The apparent purpose was to suggest defendant could not have gotten home from Marker 11, where Crappa allegedly saw him between 5 and 5:30 on the 20th, in time to make his 5:54 call to Fremont. Simple mathematics demonstrate that the proof is not persuasive.

[5]During cross-examination, there had been much sparring about whether her evasive responses to police questioning, and at the preliminary hearing, were outright lies. For example, she was asked at the hearing whether the Datsun "[had] its lights on" when she confronted it on the 21st and whether "there [was] anybody inside that [she] could see." She answered that "[t]he only thing I remember is seeing that car." At trial, Crappa characterized this as "answering [literally] the question I was asked" but conceded the response was misleading in light of her true knowledge.

[6]Confabulation is a process by which the witness fills gaps in memory with false and imaginary information, often implanted by others, and comes to believe in the truth of his reconstruction. (See *People* v. *Shirley* (1982) 31 Cal.3d 18, 31, 64 [181 Cal.Rptr. 243, 641 P.2d 775].)

views on whether the tapes suggested that Crappa had been "brainwashed" or otherwise led, while in a suggestible state, to false memories.

Finally, the defense produced witnesses intended to undermine the evidence given by Dove and Herrera. Joseph Drake, another inmate, insisted that defendant had given no information while in jail awaiting trial. Rather, said Drake, he, Dove, and Herrera had fabricated defendant's "admissions" from television and newspaper reports, as part of a plan to strike an informers' bargain with the authorities. Gregory Jones, a former deputy public defender, declared that he had represented Herrera in a probation revocation matter; court and counsel there had discussed consideration for Herrera's testimony in this case. The prosecution responded with two law enforcement witnesses who had used Drake as an informant. They stated that his reputation for credibility was low.[7]

### PRINCIPAL GUILT PHASE ISSUES

Defendant argues that because the valid evidence at trial was legally insufficient to show either premeditated murder or forcible kidnaping, the convictions and special circumstance finding must be set aside, and that further proceedings on the unproved allegations are barred by the double jeopardy clause. (E.g., *Burks* v. *United States* (1978) 437 U.S. 1, 16-18 [57 L.Ed.2d 1, 12-14, 98 S.Ct. 2141]; *People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468].) He also urges that the information must be quashed insofar as it charges kidnaping, since the evidence at his preliminary hearing was insufficient to establish probable cause on that count. (See § 995 et seq.)

We reject both contentions. However, we accept defendant's alternate premise that improper disclosure at trial of his prior crimes may have affected the jury's deliberations. We must therefore reverse the guilt and special circumstance determinations. We discuss our reasoning in detail.

### A. Evidence of forcible kidnaping.

■ All parties concede that, at the time of Robin's disappearance, force or fear was a necessary element of kidnaping unless asportation was from outside the state, or done for slavery, robbery, or extortion. (§ 209; former § 207; *People* v. *Green, supra,* 27 Cal.3d 1, 64; *People* v. *Camden* (1976) 16 Cal.3d 808, 813-814 [129 Cal.Rptr. 438, 548 P.2d 1110].)[8] ■ De-

---

[7]The petition for habeas corpus filed herein also urges that Herrera's and Dove's trial testimony was perjured.

[8]Section 207 was amended in 1982 to provide that any asportation of a child under 14 for purposes of molesting him or her is kidnaping. (See new subd. (b).)

fendant vigorously contends that proof of force or fear was lacking. We think a rational trier of fact could find beyond a reasonable doubt that force or fear was used to transport Robin. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

█ Even if the victim's initial cooperation is obtained without force or the threat of force, kidnaping occurs if the accused " 'subsequently restrains his victim's liberty by force and compels the victim to accompany him further.' " (*People* v. *Camden, supra,* 16 Cal.3d 808, 814, quoting *People* v. *Gallagher* (1958) 164 Cal.App.2d 414, 420 [330 P.2d 464]; *Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392, 402 [173 Cal.Rptr. 906].) "The force used against the victim 'need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.' " (*Parnell, supra,* quoting *People* v. *Stephenson* (1974) 10 Cal.3d 652, 660 [111 Cal.Rptr. 556, 517 P.2d 820].)

█ Imprisonment for any substantial distance in a moving vehicle is forcible asportation. Thus, where the victim expresses the desire to leave the car, or not to accompany the defendant in the direction he is going, but the defendant ignores the plea and continues to drive so fast that the victim cannot escape, force or fear is established. (*People* v. *Camden, supra,* 16 Cal.3d 808, 811-812; *People* v. *La Salle* (1980) 103 Cal.App.3d 139, 146-147 [162 Cal.Rptr. 816].) Such a situation is particularly threatening to a child. (*Parnell* v. *Superior Court, supra,* 119 Cal.App.3d 392, 402.)

█ Here, there is both direct and circumstantial support for the charge of forcible kidnaping. The People introduced evidence that Robin was a responsible child, highly motivated to meet her late-afternoon ballet appointment. Yet she never arrived for that appointment, and Dana Crappa claimed to have seen her in defendant's company at the scheduled time, some 40 miles distant from both her home and the dance studio. Defendant was a virtual stranger, and Jackye Young testified that Robin had found him "strange." The jury could reasonably infer that she had not accompanied him voluntarily.

Moreover, inmate Herrera testified to defendant's statement that he had lured Robin into his automobile with a ruse about magazine photos, then locked the car's only passenger-side door. Under the circumstances, the jury could conclude that the door was locked to prevent Robin's escape.

Thereafter, defendant told Herrera, he drove toward Pacific Coast Highway. During this period, Robin said she "wanted to get out of the car" and asked to be let out at the next corner. Defendant failed to comply.

The death scene was far from Pacific Coast Highway, suggesting that Robin was kept in the car for a substantial period and distance after she asked for her freedom. The jury was not required to assume that she gave new consent to the asportation by voicing no further protest. Her motivation to be elsewhere, and the coercive atmosphere created when defendant ignored her original plea, make the possibility of new consent remote.

We need not be convinced beyond a reasonable doubt that defendant kidnaped Robin by force. We must merely determine whether "*any* rational trier of fact" at all could be so persuaded. (*People* v. *Johnson, supra,* 26 Cal.3d 557, 576, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781], rehg. den., 444 U.S. 890 [62 L.Ed.2d 126, 100 S.Ct. 195, italics in original.) ▮ The factfinder may weigh the credibility of witnesses and draw all reasonable inferences from the evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) ▮ Herrera's testimony, supported by circumstantial evidence suggesting Robin would not have gone voluntarily to Sierra Madre, furnish an ample basis for a finding of forcible kidnaping.

▮ Defendant asserts, however, that Herrera's testimony about what actually happened in the car must be disregarded, since it is not directly corroborated. Because of a jailhouse informant's motive to lie, defendant suggests the informant's uncorroborated testimony is unworthy of "full credit" as a matter of law.[9]

The contention lacks merit. ▮ Evidence Code section 411 provides that "*[e]xcept where additional evidence is required by statute,* the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Italics added.) The Penal Code sets forth the exceptions applicable in criminal cases. They include treason (§ 1103; see also Cal. Const., art. I, § 18 [court confession or two witnesses]), perjury (§ 1103a [contradiction of testimony by single other person insufficient]), abortion or enticing away for prostitution (§ 1108 [uncorroborated testimony of prosecutrix insufficient]), theft by pretense without false token (§ 1110 [false writing or two witnesses required]), and accomplice testimony (§ 1111 [insufficient for conviction if uncorroborated]). ▮ Moreover, the corpus delicti of a crime may not be proved solely by the accused's admissions. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]; see discussion, *post.*)

▮ But for these exceptions, an interested witness' "entitle[ment] to full credit" under section 411 is a matter for the trier of fact. (E.g.,

---

[9]Defendant develops the argument more fully in his petition for habeas corpus, but we consider it as properly raised on appeal.

*Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 918-919, and fn. 6 [109 Cal.Rptr. 473, 513 P.2d 353].) Thus, for example, there is no bar to conviction of a sex crime solely on the uncorroborated testimony of the complaining witness. (E.g., *People* v. *Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123]; *People* v. *Sylvia* (1960) 54 Cal.2d 115, 122 [4 Cal.Rptr. 509, 351 P.2d 781], disapproved on other grounds, *People* v. *Kelley* (1967) 66 Cal.2d 232, 242 [57 Cal.Rptr. 363, 424 P.2d 947].)

The exception for accomplice testimony, which defendant deems most analogous, arises from the accomplice's overwhelming motive to shift blame to defendant. He must do so, either to minimize his own liability at trial, or to convince the authorities it is worth immunizing him to obtain his testimony against the defendant. Whatever consideration a jailhouse informant may expect for testifying, the direct, compelling motive to lie is absent.

Here, the jury was fully apprised of the possible selfish motives for Herrera's testimony, and it was labeled false by another inmate. **(9)** (See fn. **10.**) No basis appears for a judicial exception to the clear policy of section 411.[10]

Though defendant does not address the point, we note that the corpus delicti of a crime must be proved independent of the accused's extrajudicial admissions. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 455; see 1 Witkin, Cal. Crimes (1963) § 89, p. 85.) Thus, before the jury could find that defendant kidnaped Robin, a case of force or fear must appear from evidence other than Herrera's account of his conversation with defendant. The jury was so instructed. (CALJIC No. 2.72, as modified.)

The independent proof may be by circumstantial evidence (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 25 [139 Cal.Rptr. 275]), and it need not be beyond a reasonable doubt. A slight or prima facie showing, per-

---

[10]Even if Herrera's statements must be "corroborated" as a matter of law, such corroboration exists here. There need not be independent support for *each fact* testified to by the suspect witness; corroboration is sufficient for this purpose if it "tends to connect the defendant with the commission of the offense [charged] in such a way as reasonably may satisfy a jury that the [witness] is telling the truth." (E.g., *People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423], quoting *People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556] [overruled on other grounds, *People* v. *Green, supra,* 27 Cal.3d 1, 32-34].) Circumstantial evidence is sufficient, "although such evidence 'is slight and entitled, when standing by itself, to but little consideration.'" (*Holford, supra,* quoting *People* v. *McLean* (1890) 84 Cal. 480, 482 [24 P. 32].) The circumstances surrounding the abduction here serve that purpose. Moreover, the jury was entitled to believe the truth of defendant's statement to Herrera that he refused to release Robin, even if it disbelieved other portions of the remarks Herrera attributed to defendant.

mitting the reasonable inference that a crime was committed, is sufficient. (*People* v. *Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Mehaffey* (1948) 32 Cal.2d 535, 545 [197 P.2d 12], cert. den., 335 U.S. 900 [93 L.Ed. 435, 69 S.Ct. 399].) If the independent proof meets this threshold requirement, the accused's admissions may then be considered to strengthen the case on all issues. (*People* v. *McMonigle* (1947) 29 Cal.2d 730, 738 [177 P.2d 745].)

■ Measured by this standard, there was adequate preliminary evidence, aside from defendant's admissions, to suggest that Robin was abducted by force or fear. As we have seen, the circumstantial evidence presented made it highly unlikely that Robin had accompanied defendant willingly to the death scene.

An inference of force or fear on this basis is not "speculative," "conjectural," or "fantastic" in the context of establishing the corpus delicti. (Compare, e.g., *Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 395-396 [157 Cal.Rptr. 809]; *People* v. *Schuber* (1945) 71 Cal.App.2d 773, 776-777 [163 P.2d 498].) The corpus delicti rule was satisfied, and there was sufficient evidence of forcible kidnaping.

*B. Evidence murder was premeditated.*

■ Defendant argues that the evidence of premeditation and deliberation is insufficient to sustain a verdict of first degree murder. We disagree.[11]

■ *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*) isolated three categories of circumstantial evidence which, in appropriate combination, might justify the finding that an intentional killing was calculated rather than impulsive. The first concerns "planning"—"facts about how and what defendant did *prior* to the actual killing which show that [he] was engaged in activity directed toward, and explicable as intended to result in, the killing . . . ." The second involves "motive"—"facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill . . . ." The third focuses on methodology—whether "the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a

---

[11]Premeditation was the sole theory available for a verdict of murder in the first degree, since there was no charge or evidence of any one of the specific additional crimes (arson, rape, robbery, burglary, mayhem, or child molesting) which will support a first degree finding under the felony-murder doctrine. (§ 189.) The jury was instructed on *second degree* felony murder, based upon the charge of forcible kidnaping. (§§ 187-189.)

particular way for a 'reason' which the jury can reasonably infer . . . ." (Pp. 26-27, all italics in original.)

Evidence in only one of these areas most often is insufficient. Where fewer than all three indicia are present, we require "at least extremely strong evidence of (1) [planning] or evidence of (2) [motive] in conjunction with either (1) or (3) [deliberate manner of killing]." (P. 27.)

■ The fact that a slaying was unusually brutal, or involved multiple wounds, cannot alone support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random "explosion" of violence as with calculated murder. (Pp. 24-25; *People v. Robertson* (1982) 33 Cal.3d 21, 48 [188 Cal.Rptr. 77, 655 P.2d 279]; *People v. Smith* (1973) 33 Cal.App.3d 51, 64 [108 Cal.Rptr. 698], overruled on other grounds, *People v. Wetmore* (1978) 22 Cal.3d 318, 324 [149 Cal.Rptr. 265, 583 P.2d 1308].)

■ Here the evidence, viewed most favorably to the People, suggests that defendant met and photographed Robin, devised and executed a scheme to abduct her, kept her in his car by force or fear, drove her a considerable distance from urban surroundings to a rural area, then took her on foot away from the road to an even more secluded spot "where others were unlikely to intrude." (*Anderson, supra,* 70 Cal.2d 15, 27.) The jury could conclude he carried a knife with him to the death scene and used it to kill Robin. Dana Crappa testified that Robin's body was "all cut up." A Kane Kut knife containing human blood, and a towel with "wipe" stains of type A blood, were found nearby. There was a set of similar knives at defendant's home.

Of course, use of a deadly weapon is not always evidence of a plan to kill. (E.g., *Anderson, supra,* 70 Cal.2d 15, 21-22 [knife].) Moreover, as defendant points out, not all "planned" conduct with the victim is "actively directed toward, and explicable as intended to result in, [a] killing . . . ." (*Id.,* at p. 26.) Defendant suggests his conduct prior to the homicide was "highly ambiguous" (*id.,* at p. 31) and, however felonious, showed no preconceived "*intention to kill* his victim" (*id.,* at p. 33, italics in original).

However, when one plans a felony against a far weaker victim, takes her by force or fear to an isolated location, and brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset. (Compare, e.g., *People v. Haskett* (1982) 30 Cal.3d 841, 850 [180 Cal.Rptr. 640, 640 P.2d 776]; *People v. Hillery* (1965) 62 Cal.2d 692, 704 [44 Cal.Rptr. 30, 401 P.2d 382]; cf., *People v. Quicke* (1964) 61 Cal.2d 155, 158-159 [37 Cal.Rptr. 617, 390

P.2d 393].) Thus, there is substantial evidence of a "planned" killing—the most important prong of the *Anderson* test.

The record also discloses a plausible motive for the killing. Apparently there were no eyewitnesses to the abduction except defendant and his victim. If defendant saw Dana Crappa drive by as he walked up the ravine at Marker 11 with Robin, he may not then have attached any significance to the encounter. According to Robert Dove, defendant felt safe even after his arrest because "nobody seen me take her," and they would "never find the bike."

The evidence thus suggests that defendant had committed a serious felony, kidnaping, on the victim and believed she was the only person who could implicate him. "[H]ence he could [surmise] that by killing her . . ., he would eliminate the only [witness] to his [crime]." (*People* v. *Haskett, supra,* 30 Cal.3d 841, 850.)

Finally, Dana Crappa's description of the body—"all cut up"—conveys the impression of multiple stab wounds. Damage to the teeth and jaw also indicated a blow to the head with a blunt object. When considered in light of the planning and motive evidence, this brutal method of killing supports the inference of a calculated design to ensure death, rather than an unconsidered "explosion" of violence. (See *Anderson, supra,* 70 Cal.2d 15, 29-30.)[12] Under all the circumstances, we find ample evidence of premeditation and deliberation.[13]

### C. *Motion to quash information for lack of probable cause.*

Defendant filed a pretrial motion under section 995 to set aside the information on grounds that the preliminary hearing had failed to establish probable cause. He challenges the court's refusal to strike on this ground the charge and special circumstance of kidnaping.

---

[12]We recognize that, in both Dove's and Herrera's accounts of their jailhouse conversations with defendant, he denied stabbing Robin. His comments to Dove and Herrera also suggested that he reacted with sudden violence only when she became upset and resisted him. Nonetheless, the jury was not obliged to accept defendant's version.

[13]Because there was substantial evidence of an intentional, premeditated killing, on which evidence the jury must have relied to find first degree murder (see fn. 11, *ante*), we do not face the problem addressed in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], i.e., "whether a defendant can be charged or convicted of murder with the *special circumstance* of felony murder [here, murder in the course of a forcible kidnaping; see §§ 207, subd. (a), 190.2, subd. (a)(17)(ii)] under the 1978 death penalty initiative if he did not intend to kill or to aid in the commission of a killing." (Italics added; see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds, *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

Illegalities in pretrial commitment proceedings, other than those which are "jurisdictional in the fundamental sense," are not reversible error per se on an appeal from the subsequent trial. Rather, "defendant [must] show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].)

Defendant suggests that a failure of evidence at the preliminary hearing is a jurisdictional defect. Such, of course, is not the case; were it so, the jurisdictional exception would swallow the rule.

Prior to *Pompa-Ortiz, People* v. *Elliot* (1960) 54 Cal.2d 498 [6 Cal.Rptr. 753, 354 P.2d 225] had established that *all* material errors in pretrial commitment proceedings were "jurisdictional," since they meant defendant had been "illegally committed." In overruling *Elliot, Pompa-Ortiz* rejected the prior case's "uncritical use of the term 'jurisdiction'" in the context of matters correctible by pretrial writ, rather than to mean "legal power to hear and determine a cause." Under *Pompa-Ortiz,* only an absence of this latter kind of jurisdiction can furnish grounds for reversal per se after a fair trial. (27 Cal.3d at pp. 528-529.)

An evidentiary deficiency at the preliminary hearing does not meet that standard. The statutes have long provided that lack of probable cause at the preliminary hearing is waived *for all purposes* if not timely pursued prior to trial. (§§ 995, 996, 999a; *Elliot, supra,* at p. 505.) It follows that a failure of probable cause is not an unwaivable "jurisdictional" defect in the commitment which warrants reversal, or a quashing of the information, even though defendant's trial was fair.[14]

Defendant claims he was prejudiced at trial by the superior court's failure to strike the kidnaping charge for lack of probable cause. At the preliminary hearing, jail inmate Ricky Rodriguez provided the only direct evidence on the kidnaping charge; his description of alleged conversations with defendant suggested that Robin had not been kept in defendant's car by force or fear. The People urged to the magistrate that no proof of force or fear was necessary to show kidnaping. The magistrate demurred, correctly citing *People* v. *Stephenson, supra,* 10 Cal.3d 652, and *People* v.

---

[14]Indeed, it was a probable cause case which began the confusion about the effect on appeal of errors in pretrial commitment proceedings. As *Pompa-Ortiz* noted, *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319 [121 P.2d 713], had used "jurisdictional" terminology simply to establish the right to pretrial writ review of probable cause determinations. (Pp. 321-322.) *Elliot* then "utilized the *Greenberg* language in fashioning the per se reversal rule, thus introducing into the field of appellate review the [much broader] concept of jurisdiction used in the prohibition context. . . ." (*Pompa-Ortiz, supra,* 27 Cal.3d at pp. 528-529.)

*Camden, supra,* 16 Cal.3d 808, but still bound defendant over on kidnaping charges.

At trial, the People produced inmates Robert Dove and Herrera, who testified that defendant admitted keeping Robin in his car forcibly. Defendant urges that the People thus "misled" the magistrate, then improperly "changed the facts" at trial to "fit the law."

However, the People are not bound at trial by the factual theories, evidence, or testimony adduced at the preliminary hearing. (But cf., *Coleman* v. *Alabama* (1970) 399 U.S. 1, 9-10 [26 L.Ed.2d 387, 396-397, 90 S.Ct. 1999]; *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 588 [150 Cal.Rptr. 435, 586 P.2d 916] [general value of preliminary hearing as defense discovery tool].) Defendant does not claim he was surprised at trial by the use of Dove and Herrera rather than Rodriguez, or by their different testimony. If error occurred on the section 995 motion, we can find no prejudice.

*D. Introduction of prior crimes.*

 As in the trial court, defendant urges strenuously that evidence of prior uncharged conduct was improperly admitted and considered as evidence of his guilt. He relies on the general rule against use of prior conduct to show a "disposition to commit" the crime charged. (Evid. Code, § 1101, subds. (a), (b).) He also argues the prior crimes should have been excluded in any event as more prejudicial than probative. (*Id.,* § 352, subd. (b).)

In response, the People invoke the statutory exception which allows admission of prior conduct to show "motive, . . . intent, . . . plan, . . . [or] identity, . . ." (Id., § 1101, subd. (b).) The jury was instructed that it could consider the evidence on each of those issues. (See fn. 19, *post.*)

We conclude that the prior acts were inadmissible on all of these theories, and that the error was prejudicial on all charges. We summarize the challenged evidence.

Witnesses testified that on the morning of September 25, 1968, defendant stopped Tali S., an eight-year-old girl who was walking to school along Sunset Boulevard in Los Angeles. He offered her a ride, and she entered his car. When he proposed a short detour to his nearby home, she panicked but could not get out of the moving auto.

Inside the house, defendant showed her a psychedelic poster of forests and trees. Meantime, a witness who had followed defendant called the po-

lice. They arrived 10 minutes later and saw defendant, unclothed, peering out the front window. They broke down the door. Tali was found lying on the kitchen floor, naked, unconscious, and barely breathing. She had a severe head wound and blood was coming from her vagina. There was a steel bar over her neck. The house was full of photography equipment.

Defendant escaped through the rear door and became a fugitive. In 1972, he was returned to California and convicted of violating Penal Code section 288 (child molesting).

Defendant was paroled on the section 288 conviction in August 1974. On the morning of October 13, he approached Julie J., a small, undeveloped 13-year-old, as she was waiting for a bus to school in Huntington Beach. According to her testimony, he ingratiated himself with conversation, and, after some hesitation, she accepted his offer of a ride to school. They passed her building, and she asked several times to be let out. At first, defendant said he was checking an apartment in the area and wouldn't take long, but he finally told her rudely to be quiet. She became frightened.

When defendant stopped at the cliffs overlooking the beach (apparently the same general area where he photographed Robin Samsoe), Julie tried to get out and run, but defendant had come around to her door, and he grabbed her arm. He steered her on foot to a spot along the cliffs, forced her to smoke marijuana, and seized her leg when she tried to leave. He then put his arms around her, gave her a French kiss, and asked if she liked boys and was passionate when she was "loaded." The incident ended when a ranger arrested them both for the marijuana violation. Defendant's parole was revoked. He was returned to prison until 1977, when he was paroled again.

According to defendant's taped confession, not challenged on this appeal, he picked up Monique H., who was hitchhiking in Riverside County on February 12, 1979. Monique was a well-developed 15-year-old. The two drove to defendant's residence and spent the night together, engaging in consensual sex. The next morning, they went to some mountains, where defendant took pictures of Monique in the nude, and of the two performing simulated sex acts together. At some point, Monique became frightened and began to scream and struggle. Defendant tied her up, stuffed a T-shirt in her mouth, beat her unconscious, and raped her vaginally and anally. He said he had not planned the violence, but was "incoherent" and frightened about a situation that had gotten out of hand. Ultimately, he drove Monique back to civilization, where she notified the police.

The rule excluding evidence of criminal propensity is nearly three centuries old in the common law. (1 Wigmore, Evidence (3d ed. 1940)

§ 194, pp. 646-647.) Such evidence "is [deemed] objectionable, not because it has no appreciable probative value, *but because it has too much.*" (Italics added.) Inevitably, it tempts "the tribunal . . . to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." (*Id.,* at p. 646; quoted in *People* v. *Schader* (1969) 71 Cal.2d 761, 773, fn. 6 [80 Cal.Rptr. 1, 457 P.2d 841].)

██ California's codification of the common law rule (Evid. Code, § 1101, subd. (a)) is absolute where it applies. However probative to common sense, evidence must be excluded under section 1101, subdivision (a), if the inference it directly seeks to establish is solely one of propensity to commit crimes in general, or of a particular class. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883].)[15]

██ This absolute rule of exclusion does not apply to prior conduct, even if criminal, which is relevant to prove more than mere criminal predisposition. The test of relevance is whether the evidence "tend[s] logically, naturally, and by reasonable inference, to establish any fact[s] material for the people [such as identity, intent, plan, motive, preparation, or opportunity] or to overcome any material matter sought to be proved by the defense." (*People* v. *Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924], cert. den., 329 U.S. 790 [91 L.Ed. 677, 67 S.Ct. 356], rehg. den. (1947) 329 U.S. 832 [91 L.Ed. 705, 67 S.Ct. 490], cert. den., 331 U.S. 783 [91 L.Ed. 1815, 67 S.Ct. 1185].)

However, because other-crimes evidence is so inherently prejudicial, its relevancy is to be "examined with care." It is to be received with "extreme caution," and all doubts about its connection to the crime charged must be resolved in the accused's favor. (*People* v. *Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700]; *Peete, supra.*)

██ Moreover, because of its inflammatory impact, evidence of other offenses sometimes must be excluded "[e]ven if [it] is relevant under a theory . . . that does not rely on proving disposition . . . ." (*People* v. *Thompson, supra,* 27 Cal.3d 303, 318.) Thus, it is inadmissible if not relevant to an issue expressly in dispute (*Thompson, supra,* at p. 315), if "merely cumulative with respect to other evidence which the People may

---

[15]However venerable and sound, the rule can cause frustration. "Reasonable persons may fret over the wisdom of permitting an incorrigible scoundrel to 'start his life afresh' when charged with the umpteenth repetition of some particular offense. . . ." (*People* v. *Wills-Watkins* (1979) 99 Cal.App.3d 451, 457 [160 Cal.Rptr. 289], fn. omitted [conc. opn. of Kaus, P. J.].)

use to prove the same issue" (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366], quoting *People* v. *Schader, supra,* 71 Cal.2d 761, 775), or if more prejudicial than probative under all the circumstances. (*Thompson, supra,* at p. 318; *People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].)

■■■ The fundamental issue in this case was the identity of Robin Samsoe's abductor and killer. The People contend that evidence of defendant's prior crimes was admissible on that question since the similarity of the earlier offenses to the current ones suggests strongly that the same person committed them all. We cannot agree.

■■■ Where the prosecution seeks to fix responsibility for a particular crime on defendant by showing a consistent modus operandi, there must be common marks which, considered singly or in combination, support the strong inference that the current crime bears his signature. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], overruled on other grounds, *People* v. *Flannel, supra,* 25 Cal.3d 668, 684, fn. 12; *People* v. *Sam, supra,* 71 Cal.2d 194, 204; *Haston, supra,* 69 Cal.2d 233, 247.) ■■■ The People point to various common elements in the charged and uncharged offenses here. They note that defendant's pattern is to approach underage girls, engage them in conversation, entice them into his automobile, restrain them by force when they wish to leave, and take them to remote locations, often scenic outdoor settings, where he assaults them and commits forcible sexual acts. In many instances, the People emphasize, he uses photography as a ploy to gain the victims' cooperation.

But the alleged similarities break down under examination. Monique H. was never restrained in defendant's car by trick, force or fear. Neither outdoor settings nor the use of photography figured in the Tali S. incident (though there was camera equipment in the house). The People's strained theory that defendant supplied those elements by showing Tali a psychedelic poster of forests and trees is not persuasive. There was no element of photography at all in the Julie J. incident. In none of the three cases was photography used as an introductory ploy, and there seems nothing consistent or unusual in the techniques defendant used to ingratiate himself.

Despite the People's suggestion that locale was important to defendant, the sites of his offenses were widely scattered and dissimilar. Moreover, defendant's pattern of sexual conduct in the other cases was not consistent or distinctive. He gave Julie J. a "French kiss" but made no further physical advances before he was arrested. Monique H. was physically mature, and the acts committed on her occurred only after lengthy sessions of consensual

sex. Most importantly, Robin was killed, while the earlier victims were not.[16]

To the extent a "pattern" can be found in these incidents, it is entirely unremarkable. The similarities noted by the People must be common to a substantial portion of the population of child molesters. By definition, their victims are children, who must be induced to submit under circumstances in which escape or detection is unlikely. The use of charm or deception, and transportation to places of privacy, are logical means of accomplishing those aims. So, tragically, is violence. The People have not convinced us that a peculiar pattern in defendant's past conduct establishes his identity as Robin's killer by setting him apart from the general class of violent sex offenders against children.

 Nor can admission of the prior crimes be justified by their asserted relevance to the question of defendant's "intent" when he approached Robin and her friend at the beach. Aside from modus operandi, the prosecutor urged the jury to consider the crimes on the theory that this "intent" was an intermediate fact bearing on the ultimate issue of identity. (See *People v. Thompson, supra,* 27 Cal.3d 303, 315, and fn. 14.)[17] However, in seeking to connect the events on the beach and the charged crimes, he simply assumed the critical fact at issue, namely that defendant "actually [did] get Robin . . . to go with him."

The beach encounter certainly has some relevance on the question of identity. It is suspicious that, within hours before her disappearance, defendant had approached Robin, a child he did not know, and had hurried away when another adult intervened. There is no question that evidence of this encounter was properly admitted.

---

[16]The evidence suggests that Tali S. was left for dead. She was in bed for two and a half months and out of school for four.

[17]As the prosecutor declared in his closing argument: "The court will instruct you that [the] other offenses may be offered to show intent, to determine his method of operation, to determine a plan or scheme . . . similar to the method, plan or scheme . . . in this case, which would tend to further show the existence of the intent, . . . and the identity of the person who committed the crime . . . . [¶] The other acts are also available to you to consider the defendant's motive. . . . It is important, we felt, to show you this, so that you would know that we don't just have a man down at the beach taking pictures of young girls. [¶] There is a tremendous difference between a man down at the beach taking pictures of young girls and a man who is a sex pervert, who is a child molester, who is down at the beach taking pictures of young girls and trying to get those girls to go with him; especially when just a very short period of time after he tries to get a girl to go with him [this could refer to Joanne Murchland, Patty Elmendorf, or Lorrie Werts], he actually does get Robin Samsoe to go with him. [¶] It shows motive. It shows why he was kidnapping Robin, why he was taking her up to the hills and why he had to kill her afterwards, so that she would not report him."

However, the prior crimes add nothing valid to that evidence. They exhibit no specific points of probative similarity which might suggest that defendant's approach to Robin was a precursor to her unobserved abduction some hours later. In fact, they invite such an inference, if at all, only by exposing defendant's penchant for child molestation. To that extent, the prosecutor's theory of "intent" was but a euphemism for proving the identity of Robin's killer by establishing defendant's general disposition to commit similar crimes. Of course, any effort to use prior crimes for that purpose is expressly forbidden by Evidence Code section 1101. (*Thompson, supra,* at pp. 320-321; see also *People* v. *Guerrero* (1976) 16 Cal.3d 719, 728 [129 Cal.Rptr. 166, 548 P.2d 366].)

 For similar reasons, the evidence could not be bootstrapped in on the theory that it showed defendant's "plan or scheme." Mere use of those words adds nothing to a case for the admission of prior offenses. The proffered evidence must still be analyzed to determine whether it proves something material, disputed, and beyond bare disposition. (*Thompson, supra,* 27 Cal.3d at pp. 315-318.)

There was no contention in this case, nor could there be, that Robin's kidnap and murder were part of a single conspiracy, conception, or plot of which the 1968, 1977, and February 1979 incidents were also integral components. (See, e.g., *People* v. *Covert* (1967) 249 Cal.App.2d 81, 85-86 [57 Cal.Rptr. 220].) Rather, "plan or scheme" was used here synonymously with the theories of admissibility already discussed. Indeed, both the prosecutor's argument and the modified instruction employed the phrase "characteristic method, plan, or scheme" as though it was interchangeable with modus operandi on the one hand, and with defendant's intent in approaching Robin on the other. Accordingly, no different rules apply to use of the prior-crimes evidence than those we have previously outlined.[18]

 Finally, we reject any implication that the prior crimes were admissible to establish a *motive* for premeditated murder. Common sense indicates that one who commits a felony upon another wishes to avoid its detection. That may lead him to the calculated murder of his victim. Here, the jury could consider the possibility that defendant killed Robin in cold

---

[18]A separate rule had developed in sex cases that prior sex offenses may be admitted to show "common plan, scheme or design," without further examination of their bearing on intent, identity, or any other disputed issue, if they "are not too remote and are similar to the offense charged and are committed with persons similar to the prosecuting witness . . . ." (See *People* v. *Thomas* (1978) 20 Cal.3d 457, 465 [143 Cal.Rptr. 215, 573 P.2d 433]; *People* v. *Kelley, supra,* 66 Cal.2d 232, 243.) Whatever relevance the *Thomas-Kelley* rule has in this case, where no sex offense is charged, *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1] has effectively overruled it. (Pp. 87-89, & fn. 8.)

blood to prevent her from naming him as her kidnaper. (See discussion, *ante.*)

However, the prosecutor argued in effect that defendant's prior crimes increased his incentive to eliminate Robin as a witness, since they might result in more severe punishment for the current offense. We cannot accept the notion that evidence of past offenses is admissible on this basis. If it were, one's criminal past could always be introduced against him when he was accused of premeditated murder in the course of a subsequent offense. The accused's mere status as an ex-criminal would place him under an evidentiary disability not shared by first offenders. The prejudicial effect of the prior-crimes revelations would vastly outweigh their slight and speculative probative value. It is just such dangers which the restrictions on evidence of past offenses seek to avoid.

*People* v. *Durham* (1969) 70 Cal.2d 171 (cert. den., 395 U.S. 968 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den. *sub nom. Robinson* v. *California* (1972) 406 U.S. 971 [32 L.Ed.2d 671, 92 S.Ct. 2416]) is not contrary. There, defendants shot and killed a police officer during a routine automobile stop. This court held that the jury could hear evidence of outstanding uncharged offenses for which defendants feared apprehension. (Pp. 186-189; see also *People* v. *Robillard* (1960) 55 Cal.2d 88, 100 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], cert. den. (1961) 365 U.S. 886 [6 L.Ed.2d 199, 81 S.Ct. 1043], overruled on other grounds, *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) In cases like *Durham* and *Robillard,* the motive of escape is central, and it can be shown in no other way. Here, the issue of witness elimination was before the jury in any event; speculation that defendant was also worried about the implications of his past record is remote and cumulative. Under these circumstances the trial court erred in admitting evidence of prior crimes.[19]

We cannot say the error was harmless. The other evidence that defendant kidnaped and killed Robin was fairly strong, but not overwhelming, and it was largely circumstantial. Besides defendant's approach to Robin, and his placement at the crime scene by Dana Crappa, the People's case centered on (1) his "admissions" to jailhouse informants whose cred-

---

[19]Defendant also argues that prior sex crimes are never admissible unless there is evidence of sexual misconduct in the current case. (See *People* v. *Guerrero, supra,* 16 Cal.3d 719, 727-728.) He claims the trial court allowed the challenged evidence only because, in pretrial proceedings under section 995, the prosecutor misled the court to believe he would produce evidence that Robin Samsoe had been sexually molested. Our conclusion that the prior incidents were inadmissible in any event because they exhibited no distinct pattern of similarity bearing on identity, intent, plan, or motive makes it unnecessary to explore this related contention.

ibility was hotly disputed, (2) his "guilty behavior" in travelling to Seattle, where he rented and filled a storage locker, (3) his possession in the locker of earrings the victim might have worn, and (4) discovery of the Kane Kut knife near Robin's body. Defendant presented a plausible alibi based in part on telephone calls he allegedly made or received in his home at crucial times; bills confirmed the calls were made. He also mounted a vigorous challenge to the credibility of Dana Crappa and pointed up material inconsistencies in her testimony. There was no knife missing from the Kane Kut set in his residence.

Under these circumstances, the jury may well have been influenced by improper consideration of the other crimes, which were highly prejudicial in their nature, in deciding that defendant was the person who abducted and killed Robin. It thus appears reasonably probable that, absent the instructional error, a result more favorable to defendant would have been reached. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243], cert. den. (1957) 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].) Accordingly, we set aside the convictions of murder and kidnaping, and the related finding of kidnaping as a special circumstance.

## OTHER ISSUES

Defendant raises numerous other claims of error at the jury selection, guilt, and penalty phases of his trial. In light of our analysis above, we need not reach them.

In his related petition for habeas corpus, defendant contends that two witnesses, Robert Dove and Michael Herrera, gave perjured testimony against him at his trial. Any resulting prejudice is dispelled by our reversal on other grounds, and the petition is therefore moot.[20]

The judgment is reversed. The petition for habeas corpus is denied as moot.

Bird, C. J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I dissent.

I cannot conclude, with the assurance of my colleagues, that the admission of evidence of prior offenses committed by defendant was erroneous, or that

---

[20]The claim of perjury is based on Dove's recantation under oath after the trial. If the prosecution recalls either accused witness on any retrial, and the witness testifies as he did at the first trial, defendant may seek to impeach him with the intervening recantation.

its admission requires reversal under *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. There were sufficient similarities in the prior offenses, all against female children, to permit their introduction on the issue of identity.

That the prior offenses against little girls did not result in a killing is not sufficient justification to find dissimilarity and to conclude that the trial court improperly exercised its discretion in admitting the evidence. (*People* v. *McCarty* (1958) 164 Cal.App.2d 322, 326 [330 P.2d 484].)

I would affirm the conviction on the ground that there has been no miscarriage of justice. (Cal. Const., art. VI, § 13.)

Respondent's petition for a rehearing was denied October 4, 1984. Mosk, J., and Lucas, J., were of the opinion that the petition should be granted.