Filed 4/5/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GERQUAN DWAYNE CLARK et al.,<br><br>     Defendants and Appellants. | C089046<br><br>(Super. Ct. No. 18FE008129) |


APPEAL from a judgment of the Superior Court of Sacramento County, Raoul M. Thorbourne, Judge.  Affirmed in part and reversed in part.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant, Gerquan Dwayne Clark.

James S. Thomson, under appointment by the Court of Appeal, for Defendant and Appellant, Anthony Maurice Brown.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II – IV.

1

Kamala D. Harris, Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Gerquan Dwayne Clark and Anthony Maurice Brown robbed three men at gunpoint. Shortly thereafter, defendants were tracked to a local retail store using a phone app on one of the cell phones they had stolen. Upon arriving at that location, police located a vehicle that matched a description received at the robbery scene. The vehicle was registered to Brown. Brown and then Clark were apprehended leaving the store. Clark had one of the victims' cell phones. In Brown's car, police found more property taken from the victims. Additionally, the other two victims' cell phones were found in the parking lot near Brown's car. At a showup, one of the victims identified both defendants, and another identified Clark. At trial, both victims identified Clark as the man who pointed the gun at them, and one victim identified Brown as the other man. Police never found the gun. At trial, defendants asserted that the prosecution had not proven beyond a reasonable doubt that the object used during the robbery was a real gun.

A jury found defendants guilty of three counts of robbery in the second degree with firearm enhancements. Additionally, the jury found each defendant guilty of possession of a firearm by a felon. The trial court sentenced Clark to an aggregate term of 21 years and Brown to an aggregate term of 12 years.

On appeal, defendants assert their felon in possession of a firearm convictions and the firearm enhancements must be reversed because (1) the trial court erred in admitting evidence of Clark's prior uncharged act involving possession of a firearm pursuant to Evidence Code section 1101, subdivision (b), on the theory that the uncharged act evidence was relevant to prove Clark knew he possessed a real gun at the time of the robberies, and (2) the prosecutor committed misconduct in urging the jurors to use that prior uncharged act as propensity evidence. Brown separately asserts (3) the prosecutor committed misconduct in vouching for the prosecution and disparaging defense counsel,

2

and (4) cumulative error requires reversal.  Finally, as to sentencing, Brown asserts (5) that because of Senate Bill No. 136 (Stats. 2019, ch. 590, § 1.) (S.B. 136), the matter must be remanded for the trial court to strike his prior prison term enhancement.

We reverse the convictions of felon in possession of a firearm as to both defendants and all firearm enhancements.  We conclude the trial court erred in admitting evidence of Clark's prior uncharged act pursuant to Evidence Code section 1101, subdivision (b), and the evidentiary error was prejudicial as to the felon in possession of a firearm count and the firearm enhancements.  Because we reverse the possession conviction and firearms enhancements, we need not reach defendant's claims that the prosecutor committed misconduct in making a propensity argument to the jury.  As for Brown's separate prosecutorial misconduct claim, we conclude the prosecutor committed misconduct in vouching for the prosecution and disparaging defense counsel, but these instances of misconduct did not prejudice Brown.  We further conclude Brown's cumulative error contention is meritless.  Finally, because of S.B. 136, we strike Brown's prior prison term enhancement and remand for resentencing as requested by the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendants were charged with robbery in the second degree (Pen. Code, § 211; counts one, two, three)[1] and felon in possession of a firearm (§ 29800, subd. (a)(1); count four).  As to each of the three robbery counts, it was alleged that Clark personally used a firearm within the meaning of section 12022.53, subdivision (b), and, as to Brown, that a principal was armed with a firearm in the commission of the robberies within the meaning of section 12022, subdivision (a)(1).  It was further alleged Brown sustained a conviction of a prior serious felony, negligent discharge of a firearm causing great bodily

---

[1]  Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

3

injury (§§ 246.3, 12022.7), and another prior conviction, possession for sale of cocaine base and concealed firearm in a vehicle (§ 25400, subd. (c)(6); Health & Saf. Code, § 11351.5), for which he served a prior prison term. (§ 667.5, subd. (b).)

**Prosecution Evidence**

The victims, J.R., O.F., and G.N. worked as construction pipelayers. On April 24, 2018, they were working on a project in Land Park in Sacramento. Sometime between noon and 12:30 p.m., they stopped working and sat by the side of the road to eat lunch together. After about five minutes, two males approached to within approximately three to four feet. One of the men pulled out a handgun and demanded money, wallets, and phones. He racked the slide of the gun. O.F. testified that the man pointed the gun at his stomach, and G.N. testified that, at one point, the man pressed the gun against his left cheek. J.R. said the gun was black and described it as a "regular handgun," "not too big, not too small." It was not a revolver because it had a slide and did not have a cylinder. O.F. described the gun as small, and, upon refreshing his recollection, agreed he had told police the gun was black and gold. He testified the gun looked real. G.N. testified the gun was small, chrome and black in color.

At trial, J.R. and O.F. both identified Clark as the man who pulled out the gun. J.R. identified Brown as the other man. O.F. testified that, because he had been focused on Clark and the gun, he did not get a good look at the other person. J.R. and O.F. both testified Clark pointed the gun at them. G.N. did not identify either defendant.

J.R. gave defendants his phone. O.F. gave defendants his wallet, containing approximately $10, credit cards, and identification, as well as his phone. G.N. had $45 or $48 in cash as well as credit cards and his license in his wallet, which he gave to the man with the gun. The other man took G.N.'s lanyard and his company phone. After the two men took items from the victims, they left. The entire incident lasted two to four minutes. J.R. acknowledged he did not see the gun for very long, only for a few seconds.

4

J.R. described the man with the gun to police as a black male, five feet eight inches tall, 175 pounds, wearing a black long-sleeve shirt, black jeans, a do-rag, and no facial hair. He described the other person as five feet 10 inches, approximately 180 pounds, and wearing a black hoodie.[2] O.F. recalled that he told officers the man with the gun who robbed him was five feet eight inches tall. O.F. testified that the man with the gun wore a sweater with a hood and what he believed to be gray sweatpants.

At 12:26 p.m., police received a 911 call reporting the robbery. Officer Keith Hughes arrived at the location of the robbery and was contacted by an area resident who handed him a note written by a neighbor who was frightened and did not want to be identified. The note pertained to a vehicle, and stated: " 'Dark green," "Paper plate on the front, Hayes Auto Sales, red background, white lettering.' "[3] The person who wrote the note told the woman who delivered it to Hughes that she had seen two large black males parked in front of her house in the car described in the note.[4]

---

[2] A DMV record for Clark indicated that he was six feet tall and 165 pounds. According to colloquy between the court and the attorneys, it appears this record was created on January 30, 2017, approximately 15 months before the robberies. A DMV record for Brown indicated he was five feet eleven inches tall and weighed 230 pounds. According to the same colloquy, it appears that this record was prepared on November 27, 2017, approximately five months before the robberies.

[3] In her in limine motions, the prosecution sought to introduce the evidence concerning the information received from an anonymous source for the purpose of the effect on the officers, "why the officers knew which car to look for." The court precluded introduction of the note, but allowed testimony about what the note said for the limited purpose advanced by the prosecution.

[4] Hughes spoke with another witness who told him she saw two individuals wearing black clothing riding away on bicycles. The trial court expressly instructed the jury that this testimony was not to be considered for the truth of what was asserted, "because somebody told the officer that. And for the purpose of then exploring, as counsel may want to explore, what, if anything, did he do with that information, and if so, why and why not." Brown makes a point of noting that, while Hughes relayed the information about the green car over his police radio, he did not relay the tip about the two individuals

5

G.F., O.F.'s wife, received a call from her father, who worked with O.F. Her father told her about the robbery, including the fact that G.F.'s phone had been stolen. G.F. tracked O.F.'s phone using a mobile phone app. When she began tracking the phone, the app indicated the phone's location was on a freeway. She tracked the phone to a liquor store on Florin Road. The phone went from the liquor store to Burlington Coat Factory on Florin Road. G.F. relayed this information to her father who was with police officers. She testified she tracked the phone for approximately an hour before it stopped at the Burlington Coat factory.[5]

Officer Frank Reyes arrived at Burlington Coat Factory at approximately 1:20 p.m. and located a green Acura with paper plates matching the description that had been broadcasted. Meanwhile, Sergeant Matthew Young arrived and instructed officers to establish a perimeter.

At 1:28 p.m., Reyes saw Brown approaching the green Acura from the store. He was talking on a cell phone. When Brown was about a car length from the Acura, he saw Reyes. He then turned around and walked back toward the store. He went back inside the store and when he reemerged, he was detained. He was sweating profusely, "[k]ind of frantic," and very nervous.

Subsequently, Young saw Clark come out of the store and look around in all directions. By this time, there were uniformed officers throughout the parking lot. Clark saw that officers were detaining Brown, turned around, and went back into the store.

---

on bicycles. While true, this is immaterial. First, the evidence was not received for the purpose of showing there were, in fact, two people wearing black clothing who left the area on bicycles at some point after the robbery. Second, even so, property stolen from the victims during the robbery was later discovered on Clark's person and in and around Brown's car.

[5] No testimony was given concerning the time G.F. began tracking or the times when the phone was at each of the locations she testified about.

6

Detective Marcel Loriaux went into the store where he detained Clark in the area of the cash registers. In searching Clark, Loriaux found some currency and J.R.'s cell phone.

Loriaux viewed surveillance video at Burlington Coat Factory. On the video, Loriaux saw Brown enter the store first, wearing a red shirt. Approximately 10 seconds later, Clark came in, bare-chested, putting on a white T-shirt.[6]

Young searched Brown and found car keys which matched the green Acura. The car was registered to Brown. Young and Reyes searched the Acura. Therein, they found G.N.'s California identification card and lanyard. They also found G.N.'s cell phone on the ground, near the car. Brown acknowledged that Clark was his cousin.

A couple found a Samsung cell phone on the ground in the parking lot next to where they parked. They gave it to officers in the parking lot who were focused on the green car parked next to their car. That phone belonged to O.F.

The victims were transported by police to Burlington Coat Factory for a showup. J.R. identified both Clark and Brown. O.F. told officers he recognized Clark as the man who had been holding the gun. He was not sure about the other individual, and indicated he did not get a good look at him during the incident. G.N. did not identify either individual. G.N. did say, about the first man he was shown, Clark, " 'That was not the clothes he had on. I don't think that was him.' " G.N. did tell the officers that he thought the pants they were wearing were the same, but he was not sure.

Police did not find a gun. Officers searched the green car, the area where the robbery occurred, the area of the liquor store where phone tracking indicated defendants stopped, and inside and outside of Burlington Coat Factory, including in the merchandise

---

[6] Loriaux did not testify that he had watched any more of the store's recording than defendants' entry. He thought the recording would be obtained by officers, but, because of miscommunication between the officers, it was not. Loriaux explained that at some point more than 30 days after the arrests, he spoke to personnel at the store and learned that the video footage had been deleted.

and the area near the cash registers where Clark was detained. But they never found the gun.

### Clark's Evidence

John Moran testified as an expert in firearms and replica firearms. He testified that that replica firearms are "dimensionally and visually similar" to real firearms. The slide can be racked on a replica firearm just like a real firearm. People have been shot by law enforcement for brandishing what turns out to be replica firearms. According to Moran, in California, Airsoft replicas are required to be sold with orange tips affixed to the barrel, but it is not a crime for the consumer to remove the orange tip. Pellet guns and BB guns are not required to be sold with an orange tip on the barrel. Moran testified of replicas: "Visually, unless it has that orange tip on it, there's really no way to tell." "[V]isually it is essentially impossible to tell the difference."

### Brown's Evidence

Dr. Geoffrey Loftus, an experimental psychologist, testified as an expert in the field of memory perception and eyewitness testimony. He testified about two routes through which information makes its way into human memory. The first is "conscious experience," essentially personal contemporaneous perceptions of the event itself. The second route is through "postevent information." According to Loftus, "witnesses can and do acquire postevent information and use it to supplement their original . . . memory of what happened. It plugs gaps, fills holes in the original memory, makes for a more coherent story of what actually happened during the event." Loftus testified that, generally, "witnesses can't tell which part of the memory came from which source, conscious information versus postevent information. And typically, witnesses always believe that it's true." Loftus elaborated: "under the right circumstances, people are perfectly capable of developing memories that are strong, detailed, very real-seeming, and that are expressed with a great deal of confidence but memories that, unbeknownst to

the witness, are potentially false in important ways because, unbeknownst to the witness, they're largely made up of postevent information whose accuracy is dubious."

Loftus discussed a body of research on " 'weapon focus.' " When a gun is used, people tend to pay attention to it. The "attentional spotlight beam" is not on other aspects of the scene, such as the appearance of the person who is holding the gun. He also testified that if there were multiple perpetrators of a crime, the victim's attention would be divided among the multiple perpetrators, resulting in less "attentional resources" devoted to each perpetrator. Additionally, Loftus testified that an individual being robbed at gunpoint would be experiencing a high stress environment. In high stress environments, people remember things "more poorly."

Loftus also testified about cross-racial identification, " the finding . . . that people are less able to identify and recognize members of other races compared to their ability to recognize and identify members of their own race." Presented with a hypothetical situation where three Latino men believed they were robbed by two African-American men, Loftus testified that this would be a situation where cross-racial identification could come into play.

Loftus also testified that witnesses tend to better remember " 'global characteristics,' " such as height, weight, clothing, and hairstyle.

Regarding identification procedures, Loftus opined that from a psychological standpoint, a lineup procedure is more reliable than a showup. He testified: "in a lineup procedure . . . , if the witness identifies the suspect, it's a genuine test of memory . . . , the match between the witness's memory of the perpetrator and the suspect['s] appearance is stronger than the match between the witness's memory of the perpetrator and the appearance of the various fillers. So it's a real test of memory." In a showup, "a witness is perfectly at liberty to make a positive identification irrespective of how well the suspect matches his memory of the perpetrator."

**Stipulations**

The trial court read the following stipulations to the jury:

"[I]t's agreed that on or about June 19, 2017 in Superior Court, State of California, for the County of Sacramento, the defendant, Gerquan Clark, was convicted of a felony."

"[B]oth counsel agree that on or about March 21, 2016 in the Superior Court of California, County of Sacramento, the defendant, Anthony Brown, was convicted of a felony."

**Verdict and Sentence**

The jury found Clark guilty of robbery in the second degree of all three victims, counts one through three, and found each of the associated section 12022.53, subdivision (b), firearm enhancement allegations to be true. The jury also found Clark guilty on count four, violation of section 29800, felon in possession of a firearm. The trial court sentenced Clark to an aggregate term of 21 years eight months.[7]

---

[7] Clark's 21 year aggregate term was calculated as follows: the midterm of three years on count one, robbery in the second degree, plus 10 years on the section 12022.53, subdivision (b), enhancement; on each of counts two and three, robbery in the second degree, one year (one-third the midterm), plus three years four months (one-third the midterm) for the associated section 12022.53, subdivision (b), enhancement; and two years on count four, felon in position of a firearm, with the sentence on count four stayed pursuant to section 654.

The abstract of judgment indicates that, in addition to the determinate term on count four, the trial court stayed a term on a 12022.53, subdivision (b), enhancement attached to count four. However, the trial court did not pronounce any such sentence. (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1070 (*Delgado*). ["[T]he abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict"].) Moreover, section 12022.53 does not apply to violations of section 29800 (§ 12022.53, subd. (a) [listing the felonies to which the section applies]), and the second amended information did not allege a firearm enhancement attached to count four. Because we are reversing Clark's conviction on count four and remanding for a new trial on that count and/or resentencing, the court will prepare an amended abstract of judgment and this error will be rendered moot.

The jury found Brown guilty on counts one through four and found the section 12022, subdivision (a)(1), armed with a firearm enhancement allegations attached to counts one through three to be true. Brown waived jury trial on his alleged strike prior, and the trial court found that allegation true. The court also found true the allegation that Brown served a prior prison term within the meaning of section 667.5, subdivision (b). The court denied Brown's motion to strike his strike prior. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) The court sentenced Brown to an aggregate term of 12 years eight months.[8]

---

[8] Brown's 12 year 8 month aggregate term was calculated as follows: the midterm of three years on count one, robbery in the second degree, doubled pursuant to section 667, subdivision (e)(1) and 1170.12, subdivision (c)(1), plus one year for the section 12022, subdivision (a)(1), firearm enhancement; on each of counts two and three, robbery in the second degree, one year, (one-third the midterm), doubled, plus four months for the section 12022, subdivision (a)(1), enhancement; the midterm of two years on count four, felon in possession of a firearm, with the sentence on that count stayed pursuant to section 654, plus one year on the section 667.5, subdivision (b), prior prison term enhancement.

When the trial court originally sentenced Brown, it erroneously doubled the sentences imposed on the firearm enhancements on counts two and three. This was error. (*People v. Sok* (2010) 181 Cal.App.4th 88, 93-94.) However, five days later, the trial court recalled Brown's sentence and resentenced him. (§ 1170, subd. (d)(1).) The trial court's purpose in resentencing Brown was to find true that his prior qualified as a "nickel prior" (§ 667, subd. (a)(1)), but the court then "str[u]ck the punishment for that under" Senate Bill No. 1393 and section 1385. In resentencing Brown, the trial court correctly doubled Brown's base terms, but did not double the enhancement sentences. However, the abstract of judgment indicates that the court imposed and stayed a one-year term on a section 12022, subdivision (a)(1), firearm enhancement on count four. There was no firearm enhancement attached to count four, and the trial court did not pronounce any such sentence. (See *Delgado*, *supra*, 43 Cal.4th at p. 1070.) Moreover, section 12022 does not apply to an offense where "the arming is an element of that offense" such as section 29800. (§ 12022, subd. (a)(1).) As with Clark, this error on the abstract of judgment will be rendered moot.

# DISCUSSION

## I. Admission of Clark's Prior Conviction of Prohibited Person in Possession of a Firearm Under Evidence Code Section 1101, Subdivision (b)

### A. Additional Background

#### 1. In Limine Motion and Trial Court's Ruling

The prosecution moved to admit evidence of the facts underlying Clark's prior prohibited person in possession of a firearm juvenile adjudication under Evidence Code section 1101, subdivision (b) (section 1101(b)). According to the motion, on September 27, 2016, gang enforcement officers stopped a vehicle in which Clark was a passenger in the front passenger seat. In a vehicle search, officers found a Glock 27 (.40-caliber semiautomatic handgun) with an extended magazine underneath the driver's seat. The gun was loaded with 15 rounds in the magazine and one in the chamber.

In her motion, the prosecutor asserted this evidence was relevant to prove motive and knowledge. The prosecutor wrote: "In both the charged and uncharged offenses, the Defendants were felons in possession of a firearm.[9] Both defendants have a huge motive to get rid of the firearm in the current offense. Defendants having suffered prior convictions for guns, know being in possession of a firearm will lead to more time in custody, and possibly prison time. Their motive to ditch the gun would be even more heightened in this case because they had just used a firearm in the commission of a robbery."[10] The prosecutor asserted the evidence was more probative than prejudicial

---

[9] In addition to Clark's prior, the prosecution also sought to admit facts underlying Brown's two prior convictions for felon in possession of a firearm. The trial court later denied the prosecution's request to admit prior uncharged acts evidence related to Brown.

[10] The prosecutor also asserted that defendants "had *knowledge* that they were prohibited persons and not allowed to be in possession of a firearm." (Italics added.) The People do not advance this theory on appeal, and for good reason. Knowledge of status as a prohibited person is not an element of the offense of possession of a firearm by a felon under section 28900. "The elements of this offense are conviction of a felony and …

under Evidence Code section 352. She asserted that the evidence did not tend to show bad character, but "merely shows that the Defendant had the required knowledge; he had the motive to possess a firearm; and that his conduct was not the result of an accident or mistake." Further, the prosecutor asserted she was aware defendants would argue that the gun used could have been fake, and that, because law enforcement did not find the gun, the prosecution could not prove it was a real gun. According to the prosecutor, the "evidence helps in a variety of ways, but most of all, it helps to show that in the past, the defendants were caught in the possession of <u>real</u> guns, not fake ones."

Clark opposed the motion, noting that, during the prior offense, he was merely a passenger in a vehicle which was stopped and in which police located a firearm underneath the driver's seat. He emphasized that there was no proof he ever wielded the firearm or that the firearm was used in a robbery or any similar violent or threatening manner. Clark asserted: "there are no facts sufficiently similar between the current and prior offenses to suggest that Mr. Clark learned about more severe consequences of personally using a firearm during a violent felony." Nor was a firearm enhancement charged from which it could be inferred Clark learned of the "increased consequences for personal use" of a firearm. He argued, in effect, the prosecution was simply employing a "back-door means of presenting propensity evidence to the jury: that because [] Clark was previously in possession of a gun, he therefore personally used a gun in this case."

Clark joined in Brown's written opposition, in which Brown pointed out that the prosecution's motive theory—motive to discard the gun—was not a theory of motive to commit the charged crime. He emphasized that "motive under Evidence Code section

---

knowing possession, custody, or control of a firearm." (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052 (*Blakely*); see also CALCRIM Nos. 2510, 2511; *People v. Snyder* (1982) 32 Cal.3d 590 [defendant's claimed mistake thinking her prior conviction was a misdemeanor and thus she did not have the legal status as a felon did not constitute a valid defense since it was a mistake of law, not a mistake of fact].)

13

1101 must be one that shows the defendant has 'an incentive to <u>commit the current</u> <u>crime</u>,' " and argued the prosecution's theory "describes motive to do an act subsequent to the crime, not the crime itself."

At the hearing on the motion, the trial court asked the prosecutor what the primary purpose for the uncharged act evidence was, and the prosecutor responded: motive. She asserted: "Motive, given the fact that both defendants have suffered prior convictions for possessing firearms when they know they're not supposed to. They know the consequences for possessing firearms, given the fact they are a felon. They understand that possessing a firearm does result in significant jail time, specifically, state prison time."

Clark's attorney asserted evidence of the prior gun possession was "straight propensity evidence. It is clearly propensity evidence." He further asserted the evidence "definitely doesn't survive the 352 balancing . . . ." He continued: "the People's argument as to [Clark's] knowledge of firearms and his motive to discard it, [Clark] has never been to prison. He doesn't know what makes someone more culpable to where they would go to prison and not. He has no prior convictions that are being alleged in this case, that would constitute a strike or a prison prior, nickel prior or anything like that. So saying [Clark] would somehow have knowledge of the increase in punishment for possessing firearms is not here." Counsel further asserted the purported motive to discard the firearm did not fit with the facts of the case because defendants did not realize they were being pursued by law enforcement as demonstrated by the fact that they "were literally caught with every other piece of evidence from this alleged robbery, other than the firearm. So there was no opportunity or motive to discard this." Additionally, counsel noted that the prosecution could argue defendants had a motive to discard a firearm without getting into prior convictions. He continued: "It's truly -- there's no noncharacter purpose for this to come in. It's straight propensity evidence."

14

Brown's attorney added: "just the concept that because these two young men have prior convictions or conduct that's alleged involving guns, that somehow this is why they might understand the concept of discarding the instrumentality of crime is ridiculous. People have gotten rid of evidence on cases all throughout time, without requiring any kind of prior knowledge based on having prior convictions."

The court then asked the prosecution "are you going to argue to the jury . . . that these guys will discard the weapon because having a weapon increas[es] somebody's punishment?" The prosecutor responded, "[t]hey know there's a heavy consequence when you utilize a weapon in . . . the commission of a robbery. That's common sense."

The trial court determined the evidence was "highly probative" and relevant to motive, "knowledge of weapons and using that firearm, one of the elements of the charge." The court concluded: "So looking at that, and then looking at the language the courts use in determining whether or not the 352 line was crossed, I'm going to allow the People to use those under 1101(b) . . . ." The court also stated that, in addition to motive and knowledge, the evidence was relevant to absence of mistake. The court ruled it would allow Clark's prior and one of Brown's two prior felon in possession of a firearm convictions. There was no discussion, either in the prosecution's written in limine motion or during the hearing, about what "knowledge" the evidence was relevant to prove.

Subsequently, the court revisited the uncharged crime evidence and the prosecutor's theory. The court confirmed the prosecution sought to admit the evidence to buttress the position that Clark had previously been convicted of a gun charge which supported the claim that defendants "deliberately ditched the gun, which has never been found . . . ." The prosecutor stated, "[i]t is motive, not necessarily motive to commit the current offense, which was addressed by [defense counsel's] motion, but just motive." She continued: "I didn't argue it as much initially, but knowledge was the second argument that I was putting forth. At this point, what the defense is putting at issue is

15

whether or not the gun was real or fake." The prosecutor then stated: "the fact they do have prior convictions dealing with real guns, not fake guns, I believe the People should be allowed to argue, shows knowledge that, in this case, they were utilizing real guns, not fake guns. That coupled with the fact that they discarded the gun. You don't discard a fake gun. You get rid of a real gun. You don't get in trouble for a fake gun. So those two things, together, I believe, should go to knowledge and that's what I was going to use the uncharged offense for."

Clark's attorney emphasized the prosecution's "first argument" was propensity: "they had real guns in the past, so they had real a gun [*sic*] in this case." The prosecutor countered, "[t]hey had knowledge that they had a real gun," and noted that was an element of felon in possession of a firearm she had to prove. Asked about the similarities between the prior and the charged offenses, the prosecutor asserted that the two were similar in that, in both instances, Clark had a real gun.

As to knowledge, Brown's attorney noted that this case did not present the situation where a person is carrying a bag and does not know there is a gun inside. He continued: "So knowledge of whether a past gun . . . is a real gun has no bearing on whether or not he knew there was a gun in this present case." He further argued: "There's no logical inference that, because in the past, he knew that he had a gun in his waistband, therefore in this case, he must have known his co-defendant had a gun."

The trial court affirmed its earlier ruling as to Clark, allowing the prosecutor to present the underlying evidence related to his prior. However, given the dissimilarities, the court precluded the evidence of Brown's prior gun possession it had earlier ruled would be admissible.

### 2. Trial Testimony and the Court's Contemporaneous Limiting Instruction

Officer Vincent Catricala testified that, on September 27, 2016, he conducted a vehicle stop. There were three individuals in the vehicle. Clark was in the front passenger seat. The passenger in the back seat was sitting behind the driver. In a search

16

of the vehicle, police found a Glock model 27 .40-caliber semiautomatic handgun under the driver's seat.  The gun had an extended magazine with 15 rounds in the magazine, which was in excess of the 10 rounds permissible under California law.  And it also had one round in the chamber.

Immediately after Catricala's testimony, the trial court instructed the jury:  "I'll say more about this at the end tomorrow, but the evidence you just heard regarding this incident involving Mr. Clark and this weapon that was found, did ultimately result in him being convicted of being in possession of a firearm by a prohibited person.  [¶]  The reason why you heard it relates to a specific issue in the case that I'm going to talk more about tomorrow.  But I need you to understand that you are not, what I do not want you to do, and I'll say more about this later, I do not want you to just think in your head:  Gee, he committed a gun crime violation before; therefore, he must be guilty in this case.  [¶] That's not how you're supposed to use that evidence.  It's for other reasons, knowledge and other things.  But don't conclude from that that he must be guilty in this case because he did it before.  [¶]  I'll say more about this later.  You were allowed to hear that for a specific purpose, which I'll say more about.  But I wanted to admonish you about that. [¶]  And also, please do not conclude the fact that Mr. Clark suffered that conviction, that we are saying anything or that there's any connection involving Mr. Brown regarding that.  That only involved Mr. Clark.  And we'll talk more about what all that was allowed in for tomorrow when we get to the closing arguments and jury instructions.  . . .  That's allowed for a limited purpose."

### 3.  Relevant Jury Instructions

Prior to closing arguments, the trial court instructed the jury with a modified version of CALCRIM No. 375, in pertinent part, as follows:  "The People presented evidence that the defendant, Gerquan Clark, committed the crime of illegal possession of

17

a firearm in 2017.[11]  [¶]  . . .  [¶]  If you decide that the defendant, Gerquan Clark, committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:  [¶]  The defendant, Gerquan Clark, knew that he possessed a firearm as charged in count four when he allegedly acted in this case;  [¶] OR  [¶]  That the defendant, Gerquan Clark, *had a motive to discard the firearm.*[12] [¶]  In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense.  [¶]  Do not conclude from this evidence that the defendant, Gerquan Clark, has a bad character or is disposed to commit crime.  [¶]  If you conclude that the defendant, Gerquan Clark, committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant, Gerquan Clark, is guilty of illegal possession of a firearm in this case.  The People must still prove the charge beyond a reasonable doubt."[13]  (Italics added.)

Immediately prior to the commencement of closing arguments, the trial court advised the jury:  "I just wanted to alert you to the fact that the evidence that I told you was considered, the one about the prior, the prior offense alleged as to defendant Clark, he was in fact convicted of illegal possession of a firearm in 2017.  And so that fact's been established.  [¶]  So I mention it to you only so you understand that evidence may be used in connection with that, of the prior offense.  Remember I gave you that instruction

---

[11]  As noted, the underlying facts occurred in 2016.  The juvenile adjudication took place in 2017.

[12]  The italicized language represents a modification regarding the theory of motive.  The bracketed language for motive in CALCRIM No. 375 reads:  "The defendant had a motive to commit the offense[s] alleged in this case."

[13]  At the jury instruction conference, Clark's attorney continued to object to the admission of the section 1101(b) evidence.  However, neither he nor Brown's attorney objected to the modified version of CALCRIM No. 375 given by the court.

about using it for a limited purpose.  Okay.  And what I'm talking about there, is the fact that he was convicted of use of a firearm in 2017.  That's defendant Clark.  [¶]  I just wanted to make sure that's on the record and that you understand what I was referring to when I was referencing that particular uncharged offense."

## B.  Defendants' General Contentions

Defendants both assert the trial court erred in admitting, pursuant to section 1101(b), evidence of Clark's prior uncharged act of illegal possession of a firearm, to prove knowledge and motive.  They assert the jury was allowed to use the evidence as propensity evidence proving that, because Clark possessed a real gun previously, he possessed a real gun here.

## C.  Evidence Code Section 1101 and the Standard of Review

"As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime.  [Citations.] 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.'  [Citations.]  ' "The natural and inevitable tendency" ' is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge."  (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).)

However, section 1101(b) provides for the admissibility of uncharged acts based on noncharacter theories.  Evidence of prior conduct is admissible when relevant to demonstrate a fact other than disposition to commit a crime, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident."  (Evid. Code, § 1101, subd. (b); *Hendrix*, *supra*, 214 Cal.App.4th at p. 238.)

"[T]he admissibility of uncharged crimes depends upon three factors:  (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any

rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other [Evidence Code] § 352 concern)." (*Hendrix, supra,* 214 Cal.App.4th at p. 238, citing *People v. Lindberg* (2008) 45 Cal.4th 1, 22 (*Lindberg*).) While courts "review for abuse of discretion a trial court's decision to admit evidence of prior conduct under section 1101, subdivision (b)" (*People v. Reyes* (2019) 35 Cal.App.5th 538, 550), as we have previously noted, courts nevertheless subject other crimes evidence to " 'extremely careful analysis.' " (*Hendrix*, at p. 238, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).)

### D.  Section 1101(b) Analysis

#### 1.  Materiality

##### a.  Ultimate and Intermediate Facts

The first factor in determining the admissibility of uncharged act evidence is the materiality of the facts sought to be proved. (*Hendrix, supra,* 214 Cal.App.4th at p. 238.) "In order to satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred. [Citation.] Elements of the offense and defenses are ultimate facts." (*Hendrix*, at p. 239.) Motive and the absence of mistake are intermediate facts. (*People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 14 (*M. Thompson*); *Hendrix* at p. 239.)

##### b.  Knowledge – An Ultimate Fact

Defendants were charged with one count of possession of a firearm by a felon. (§ 29800, subd. (a)(1).) Subdivision (a)(1) of section 29800 provides, insofar as relevant here, "Any person who has been convicted of . . . a felony under the laws of . . . the State of California . . . , and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." This offense has three elements:  (1) the defendant possessed a firearm, (2) the defendant knew that he possessed the firearm, and (3) the defendant had previously been convicted of a felony. (See *Blakely, supra,*

20

225 Cal.App.4th at p. 1052; CALCRIM No. 2511.) "Implicit in the crime of possession of a firearm is that a person is aware both that the item is in his or her possession *and that it is a firearm.*" (*People v. Kim* (2011) 193 Cal.App.4th 836, 846 (*Kim*), italics added [discussing a probation condition that referenced former §§ 12021 & 12316].) A firearm is "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion." (§ 16520, subd. (a).) "Thus, toy guns obviously do not qualify as a 'firearm,' nor do pellet guns or BB guns." (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435 (*Monjaras*).)[14] Thus, defendants' knowledge that a firearm was possessed and that it was a real firearm is material to the possession counts.

Attached to each robbery count were firearm enhancements. It was alleged that Clark personally used a firearm within the meaning of section 12022.53, subdivision (b), and, as to Brown, that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1). These enhancements required the prosecution to prove, beyond a reasonable doubt, that the object Clark pointed at the victims was indeed a firearm and that Clark knew the object he had was a firearm and so did Brown.[15]

----

[14] Pellet guns and BB guns are not firearms because, "instead of explosion or other combustion, they use the force of air pressure, gas pressure, or spring action to expel a projectile." (*Monjaras*, *supra*, 164 Cal.App.4th at p. 1435.)

[15] The trial court instructed the jury with both CALCRIM Nos. 3115 and 3146. As to the personal use enhancement, the trial court instructed the jurors with CALCRIM No. 3146, in pertinent part: "Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1. Displays the weapon in a menacing manner; [¶] 2. Hits someone with the weapon; [¶] OR [¶] 3. Fires the weapon." As to the arming enhancement, the court instructed with CALCRIM No. 3115, in pertinent part: "A principal is *armed* with a firearm when that person: [¶] 1. Carries a firearm or has a firearm available for use in either offense or defense in connection with the crimes charged in counts one, two, and three; [¶] AND [¶] 2. Knows that he or she is carrying the firearm or has it available."

Defendants' knowledge that Clark possessed a firearm, and that it was a firearm, was material to the firearm enhancements for the same reason such knowledge was material to the felon in possession of a firearm count charged in count four as to both defendants.[16]

By pleading not guilty, defendants placed all elements of the crimes charged, as well as the elements of the firearm enhancement allegations, in dispute. (*Hendrix, supra*, 214 Cal.App.4th at pp. 239-240; citing, *Lindberg, supra*, 45 Cal.4th at p. 23 ["By pleading not guilty, defendant placed all the elements of the murder as well as the attempted robbery and hate-murder special-circumstances allegations in dispute at trial"]; *Ewoldt, supra*, 7 Cal.4th at p. 400, fn. 4 [defendant's plea of not guilty puts the elements of the crime in issue for the purpose of deciding the admissibility of evidence of uncharged misconduct, unless the defendant has taken some action to narrow the prosecution's burden of proof].)[17] Thus, the uncharged act evidence concerning Clark's prior possession of a firearm was ostensibly offered for a material purpose relative to the knowledge element of the charge in count four and the firearm enhancements.[18] Whether Clark knew he had a real firearm is a material fact.

---

[16] Accordingly, because the prosecution bore the burden of proving, beyond a reasonable doubt, that Clark knew the implement he possessed was a firearm (*Kim, supra*, 193 Cal.App.4th at p. 846), we disagree with Brown's contentions that there "was no material question as to whether Mr. Clark knew he possessed the gun" and "whether Mr. Clark knew whether the gun was real or fake."

[17] Clark asserts that because he did not place his knowledge "in issue," an uncharged act could not be admitted to prove it. For this proposition, he cites an antiquated case, *People v. Perkins* (1984) 159 Cal.App.3d 646, which stated: " 'The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him "in issue." ' " (*Id*. at p. 651.) Given the modern view that a not guilty plea places all elements in dispute, we disagree with Clark's outdated contention.

[18] However, the same cannot be said about the prosecution's in limine theory that the evidence was admissible to prove the absence of mistake. We are aware of no case that

### c. Motive Theory – An Intermediate Fact

The People's motive theory for the admissibility of the prior gun possession under section 1101(b) appears to be somewhat novel. They contend that because Clark learned having a gun can result in penal consequences, he had a motive to get rid of the gun used in the robbery. This theory departs from the norm regarding section 1101(b) motive theory and the People cite no case supporting it.

As we have noted, motive is an intermediate fact, from which the existence of *an ultimate fact* may be inferred. (*Thompson*, *supra*, 27 Cal.3d at p. 315, fn. 14; *Hendrix*, *supra*, 214 Cal.App.4th at p. 239.) And for intermediate facts, "the materiality requirement is satisfied *only* if the intermediate fact tends logically and reasonably *to prove an ultimate fact*." (*Thompson*, at p. 315, fn. 14, second italics added.) Though not an ultimate fact put at issue by the charges, motive may be probative of such ultimate

_____

has held that, by pleading not guilty, a defendant places the absence of mistake in dispute. For purposes of section 1101(b), the absence of mistake is an intermediate fact, not an ultimate fact like elements of an offense which are in dispute by virtue of a not guilty plea. (See *Hendrix*, *supra*, 214 Cal.App.4th at p. 239.) Indeed, to even warrant an instruction for mistake of fact, a defendant must raise a reasonable doubt that he made a mistake about the fact in issue. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 157.) Regarding mistake of fact and uncharged act evidence, a leading commentator has described the use of uncharged act evidence to negate such a claim as follows: "[t]he defendant may concede the commission of the actus reus but deny the mens rea *by claiming* an innocent mistake. In this situation, the prosecutor may be able to introduce uncharged misconduct *to negate* mistake." (1 Imwinkelried, Uncharged Misconduct Evidence (rev. ed. 2020), § 5:33, p. 1 (Imwinkelried), italics added.) Thus, mistake of fact must be placed in issue by some litigation conduct of the defendant—for example here, by some assertion that a defendant believed a real gun was a replica. Here, neither Clark nor Brown advanced a mistake of fact defense, and therefore the absence of mistake was not a material fact. Consequently, Clark's uncharged prior gun possession was not admissible under an absence of mistake theory. Although the trial court ruled that the evidence was admissible to demonstrate the absence of mistake, it did not include that theory in its limiting instruction to the jury. And, on appeal, the People do not advance absence of mistake as a theory of admissibility; rather they advance only knowledge and motive, and, consequently, we focus the analysis that follows on those theories.

issues as intent, identity or commission of the criminal act itself. (*People v. Cage* (2015) 62 Cal.4th 256, 274; *People v. Megown* (2018) 28 Cal.App.5th 157, 166 (*Megown*).)

Defendants assert that seeking to prove the motive to discard the gun was improper because it did not relate to defendants' motives *to commit the crimes charged*. They argue that there was no direct relationship or nexus between the prior gun possession and the charged offenses.

Relying on *People v. Spector* (2011) 194 Cal.App.4th 1335, defendants assert that, in the context of section 1101(b), there are two categories of motive evidence. "In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' " (*Id.* at p. 1381.) For example, an uncharged theft might supply the motive to kill an eyewitness to the theft. (Imwinkelried, Uncharged Misconduct Evidence (rev. ed. 2020), § 3.18, p. 3-128) The evidence of Clark's prior uncharged act does not fit within this category. There is nothing to suggest that Clark's act of being in constructive possession of a firearm in a car with two other individuals in 2016 furnished Clark with a motive to possess a firearm here.

In the second category of section 1101(b) motive evidence, " 'the uncharged act evidences the existence of a motive, but the act does not supply the motive. … [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive*.' " (*Spector, supra*, 194 Cal.App.4th at p. 1381.) *Spector* itself was an example of this second category. In *Spector*, the defendant was charged with murder for the shooting death of a woman with whom he was acquainted. The question at trial was whether the defendant committed implied malice murder by killing the victim in the course of assaulting her with a firearm or whether the victim shot herself, either committing suicide or killing herself accidently. (*Id.* at p. 1342.) The trial court allowed testimony from five different women acquaintances who were victims of armed assaults by the defendant over a 20-year

24

period.  (*Id*. at pp. 1342-1343, 1372.)  Under the circumstances of the murder, the *Spector* court concluded that a jury could permissibly infer the defendant lost control in his encounter with the murder victim as he had during the prior assaults and thus had the same motive during killing as he had during those assaults.  (*Id*. at p. 1384.)

While the Attorney General acknowledges that the prosecution's motive theory does not "fit neatly" into the two motive categories described in *Spector*, the Attorney General further asserts that the prosecution's theory did establish a direct link or nexus between the commission of the prior offense and the charged crimes.  We do not agree.

Here, there is nothing to suggest there is a motive that was the cause of both the uncharged act—Clark being in constructive possession of a firearm in a vehicle with two other people in 2016—and the charged offenses and enhancements here.  Nor is there anything, or, more accurately, anything beyond pure propensity, to suggest that a specific motive caused Clark to be in possession of a firearm in 2016 and to be a felon in possession of a firearm as charged here in 2018.  Here, the prosecution's theory establishes a motive to do an act subsequent to the crime, not a motive to commit the crime itself.  Section 1101(b) should not have been used in that way here.

As we have noted, the motive contemplated by section 1101(b) is an intermediate fact from which the existence of an ultimate fact can be inferred.  Such ultimate facts include elements of the offense such as intent, identity or commission of the criminal act itself.  (*Megown*, *supra*, 28 Cal.App.5th at p. 166.)  Defendants were not charged with disposing of the gun.  Moreover, avoidance of punishment is not an ultimate fact.[19] There is simply no *direct* link or nexus between the commission of the prior offense and

---

[19]  The Attorney General asserts that "Clark's prior firearm possession offense was probative to explain his motive in getting rid of the gun *in order to complete the crime*." (Italics added.)  If the italicized portion of the People's argument was a tacit invitation to deem Clark's alleged post-robbery act of disposing of the gun an element of the robberies, we reject it.

the charged crimes. We conclude that the People have not satisfied the materiality requirement for section 1101(b) motive evidence.

### 2. Probative Value

#### a. Knowledge Theory

The second factor in determining the admissibility of uncharged act evidence under section 1101(b) is probative value—the tendency of the uncharged crimes to prove or disprove the material fact. (*Hendrix, supra,* 214 Cal.App.4th at p. 238.) Probative value goes to the weight of the evidence of the uncharged acts. (*M. Thompson*, *supra*, 27 Cal.3d at p. 318, fn. 20.) Probative value relative to section 1101(b) knowledge theory sometimes turns on the degree of similarity between the uncharged act and the charged crime. (*M. Thompson,* at p. 318.)

Defendants assert that Clark's prior conviction was not similar to the charged offenses and that it was not otherwise relevant to prove that, here, he was in possession of a real gun when he robbed the victims. Brown asserts that nothing about Clark's prior offense provided proof of relevant knowledge in the charged offenses. Brown contends that the defense at trial was that the prosecution failed to prove that the object described by the victims was a real gun, and therefore Clark's knowledge of the true character of the gun, real or fake, was not at issue.

In *Hendrix*, *supra*, 214 Cal.App.4th 216, we discussed section 1101(b) knowledge theory and the similarity consideration. There, the prosecution was allowed to admit evidence of the defendant's prior run-ins with law enforcement on the theory it was probative of the knowledge element in the charged offense, resisting an executive officer by use of force or violence. (*Id*. at p. 221; § 69.) That offense required that the prosecution prove the defendant knew the person he resisted was a police officer and knew that the officer was engaged in the performance of his duty. (*Hendrix*, at p. 237.) The defense was that the defendant may have believed the victim police officer who responded to an altercation the defendant had with private security guards was just

26

another private guard. Specifically, he contended that, because his vision was affected by pepper spray the private security guards had earlier deployed, he was intoxicated, the nighttime lighting was not good, and the security guards wore black uniforms and the police wore navy blue uniforms, he might have confused the victim police officer for another private security officer. (*Id*. at pp. 228, 240.) The prosecution was permitted to introduce evidence of prior encounters the defendant had with the police under section 1101(b) to show that defendant knew the victim was a police officer and to rebut mistake of fact. (*Id*. at p. 225.)

We noted in *Hendrix* that "[p]eople learn from their experiences" and "the knowledge gained from such experiences can be retained and recalled in the future." (*Hendrix, supra*, 214 Cal.App.4th at p. 242.) Regarding similarity, we stated: " 'Whether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue *and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime*.' " (*Id*. at p. 241, italics added; accord *People v. Felix* (2019) 41 Cal.App.5th 177, 185.)

Ultimately, we concluded it was error to allow the prior incidents in *Hendrix*. We reasoned that, because the issue was whether defendant mistakenly thought the victim officer was one of the private security guards he had encountered earlier, "the admissibility of the uncharged offenses turn[ed] on whether the experiences the defendant gained during those prior incidents prepared him to distinguish between security guards and the police." (*Hendrix, supra*, 214 Cal.App.4th at p. 243.) We explained the previous encounters with uniformed police officers would have had probative value if they had involved situations where the police issued commands and used force to detain the defendant after he had been confronted by private security guards; from such evidence, it could be inferred that the defendant learned from those experiences that the police become involved after an escalating confrontation with private

27

security personnel, and because defendant had such knowledge, it was less likely he mistook the responding police for security officers.  (*Ibid*.)  But none of the prior run-ins with law enforcement involved altercations with private security.  (*Ibid.*)

Here, the People assert that Clark learned to discern that a gun is real from the prior incident.  But the circumstances underlying Clark's prior uncharged act were dissimilar to the circumstances here and therefore the evidence had little tendency to prove the knowledge required for the charged offense and enhancements.

First, Clark's prior firearm possession was based on constructive, not actual possession.  Indeed, there was no evidence he actually had that gun in his hand at any time.  Thus, his possession in that case bore no similarity to his possession in this case.  Second, the gun in that case appears to have been very different from the gun used in this case.  J.R. described the gun defendant pointed at him as a "regular handgun," "not too big, not too small."  Both O.F. and G.N. described the gun as "small."  But the handgun from the prior event was a .40-caliber Glock with an illegal extended magazine.

As we have previously noted, in section 1101(b) similarity analysis the similarities between the uncharged and charged events "must be substantial enough to have probative value."  (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1145, citing *People v. Guerrero* (1976) 16 Cal.3d 719, 728.)  "[T]he trial court ' " 'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense*; it must examine the precise elements of similarity* between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.'  [Citation.] *If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.*" ' "  (*Winkler*, at p. 1145, quoting *People v. Williams* (2018) 23 Cal.App.5th 396, 419-420.)  Here, the prior event and charged event were similar in that defendant, in some form, possessed a handgun in each.  But that is where the similarity ends.  The degree of similarity here was not substantial enough to

have probative value, and, given the dissimilarities, a connection between the uncharged act and the ultimate fact of knowledge of the possession of a real gun has not been clearly established. We simply cannot say that defendant learned anything from his constructive possession of the .40-caliber Glock in the uncharged event that could be applied here.

Indeed, even without the dissimilarities, the inference the prosecution sought to establish here was weak at best. The prosecution's knowledge theory was that the prior uncharged act tended to establish that defendant knew he was in possession of a real gun when he robbed the victims here, and, based on this, the gun must have been real. But the prosecution's theory assumes a critical fact to prove that same fact. It assumes defendant knew he had a real gun because he had a real gun. This knowledge theory is like saying the defendant in *Hendrix*, based on his prior encounters with the police, knew the victim of the section 69 charge was a police officer and, based on that alone, the victim was, in fact, a police officer. Of course, in *Hendrix*, there was actual evidence separate from the uncharged act evidence establishing that victim was a police officer. (*Hendrix, supra*, 214 Cal.App.4th at p. 228.) Here, there is no direct evidence that the object Clark pointed at the victims was a real gun. If it was not a real gun, his prior constructive possession establishes nothing. If it was, nothing about the prior possession establishes an inference Clark knew the object was a real gun.

Moreover, the People's knowledge theory is at odds with their motive theory. If, as the People assert, Clark learned from the prior offense that possession of a real firearm could result in penal consequences, an inference could just as easily be drawn that he used an inexpensive, easily obtainable replica gun when he robbed the victims here to avoid those penal consequences. This competing inference detracts from whatever probative value the uncharged act evidence had.

Our high court "has repeatedly noted that the probative value of other crimes evidence must be substantial. ' "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial*

29

probative value." ' " (*Hendrix, supra*, 214 Cal.App.4th at p. 244; quoting, *Ewoldt, supra*, 7 Cal.4th at p. 404.) " 'If there is any doubt, the evidence should be excluded.' " (*Hendrix*, at p. 244, quoting *M. Thompson, supra,* 27 Cal.3d at p. 318.)

We conclude that any probative value Clark's prior gun possession had on the element of knowledge was insubstantial.

### b. Motive Theory

Even assuming the People's motive theory satisfied the materiality requirement, the uncharged act evidence still lacked probative value as to motive.

Similarity is not necessary to admit uncharged act evidence on a section 1101(b) motive theory. (*People v. C. Thompson* (2016) 1 Cal.5th 1043, 1115.) " 'The existence of a motive requires a nexus between the prior crime and the current one, but such linkage is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes.' " (*Ibid*.) But the sole rationale under the People's motive theory here is that Clark, having been convicted of possessing a firearm before, knew he could face additional charges and punishment if he was found to have a firearm, thus he had a motive to discard the gun.

As we have noted, probative value goes to the weight of the evidence of the uncharged acts. (*M. Thompson*, *supra*, 27 Cal.3d at p. 318, fn. 20.) Here, the evidence had little weight. Indeed, a stronger inference can be drawn that defendants discarded the object—whether it was a real gun or a replica—because it would have tied them to the robberies, not because of fear of increased punishment. Indeed, people who commit crimes are often motivated to discard evidence to avoid apprehension and punishment.[20]

---

[20] Indeed, there was other evidence indicating defendants discarded evidence that would tie them to the robberies: their clothes. When they entered the Burlington Coat Factory, Clark was seen on the store surveillance recording putting on a shirt over his bare torso, and both had on different tops when arrested than those described by the victims as worn by the robbers.

This common motive is so widespread as to have little or no probative value. (See *People v. Alcala* (1984) 36 Cal.3d 604, 634 (*Alcala*); see also Imwinkelried, *supra,* at § 3.18 [some motives, such as a desire to gain wealth or sexual satisfaction, are so common that most courts routinely exclude such evidence, reasoning that evidence of such widespread motives has little or no probative value on the issue of the defendant's identity].)

Again, we conclude the evidence of defendant's prior gun possession had insubstantial probative value.

### 3. Evidence Code section 352

The third factor to consider in determining the admissibility of uncharged act evidence is the existence of any rule or policy requiring the exclusion of relevant evidence, i.e., prejudicial effect or other Evidence Code section 352 concerns.[21] (*Hendrix, supra,* 214 Cal.App.4th at p. 238.) "Not only must the probative value of other crimes evidence be substantial, but the probative value must not be substantially outweighed by the probability that its admission would create a serious danger of undue prejudice under [Evidence Code] section 352." (*Hendrix*, at p. 246.) " ' "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " ' " (*Ibid*.)

As we have concluded, the subject evidence here had insubstantial probative value on the element of knowledge. And we have concluded that the evidence did not meet the

---

[21] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

materiality requirement for motive, and even if it did, the probative value as to the theory that defendant discarded the purported firearm after the robbery to avoid penal consequences was insubstantial. Indeed, as to motive, our high court rejected a somewhat similar motive theory some time ago in *Alcala, supra*, 36 Cal.3d 604.

In *Alcala*, the defendant was charged with the kidnapping and murder of a young girl. Several prior instances of sexual misconduct involving young girls were introduced under several section 1101(b) theories, including motive. As to motive, our high court rejected the prosecution's theory that the prior crimes were admissible to establish a motive to kill the kidnap/murder victim to eliminate her as a witness because the prior crimes might result in more severe punishment for the charged offenses. (*Alcala*, *supra*, 36 Cal.3d at p. 635.) The court wrote: "[T]he prosecutor argued in effect that defendant's prior crimes increased his incentive to eliminate [the kidnap/murder victim] as a witness, since they might result in more severe punishment for the current offense. We cannot accept the notion that evidence of past offenses is admissible on this basis. If it were, one's criminal past could always be introduced against him when he was accused of premeditated murder in the course of a subsequent offense. The accused's mere status as an ex-criminal would place him under an evidentiary disability not shared by first offenders. The prejudicial effect of the prior-crimes revelations would vastly outweigh their slight and speculative probative value. It is just such dangers which the restrictions on evidence of past offenses seek to avoid." (*Ibid*.)

Discussing *Alcala*, our high court subsequently observed: "[I]n *Alcala* we were concerned with the implications of allowing admission of evidence of past crimes for the sole purpose of showing the defendant feared punishment as a repeat offender. We reasoned such a policy would be unfair to repeat offenders because the highly prejudicial nature of prior-crimes evidence would make it difficult for such offenders to receive a fair trial, whereas the probative value of the evidence was slight." (*People v. Rogers* (2006) 39 Cal.4th 826, 864 (*Rogers*), italics omitted [factually distinguishing *Alcala* and

noting *Alcala's* concerns about the highly prejudicial nature of prior-crimes evidence were not implicated in *Rogers*; nor was the evidence offered for the impermissible and speculative purpose of suggesting the defendant was worried about the implications of his past criminal record].)

Similarly, as we have noted, common sense indicates that one who commits a felony upon another wishes to avoid its detection and might do so by getting rid of anything that could tie him to the crime. In our view, the People's theory that Clark discarded the alleged firearm to avoid penal consequences places Clark in the same situation as the defendant in *Alcala*. According to the People, his mere status as a person who was previously convicted of illegal possession of a firearm would be enough to allow the admission of the evidence on the theory that he discarded the gun because he feared greater punishment on the current offense. The same could be said of any recidivist offender. In our view, the evidence was highly prejudicial and indeed, there was a substantial danger that the prior uncharged act would convey to the jury that Clark was someone who was likely to possess real firearms.

Moreover, inflammatory, unnecessary evidence concerning the type of gun Clark was previously convicted of possessing added to the prejudicial effect. That gun, a .40-caliber handgun, had an extended magazine with 15 rounds in the magazine. The jury was told the magazine was in excess of the 10 rounds permissible under California law, a clearly unnecessary and inflammatory fact. And further, not only was it loaded, but it had a round in the chamber. Because the gun bore little resemblance to the gun used in the instant robberies, we view the evidence concerning its description as prejudicial overkill.

### 4. Section 1101(b) Analysis – Conclusion

In light of the lack of probative value of the prior gun possession evidence to prove Clark's knowledge that the object he pointed at the victims was a real firearm, the

33

seriously flawed motive theory, and the substantial danger of undue prejudice, we conclude that the trial court abused its discretion in admitting this evidence.

### E. Harmless Error Analysis

Defendants asserts that the admission of the evidence violated their federal constitutional rights. They further assert that they were prejudiced by the admission of the evidence whether prejudice is assessed under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*), implicated where a defendant's federal constitutional rights are violated, or under *People v. Watson* (1956) 46 Cal.2d 818, 836, which provides the standard for state law evidentiary error. In the end, it does not matter here which of these standards we apply because we conclude, as to the felon in possession of a firearm and the firearm enhancements, defendants have been prejudiced under the standard in *Watson*.

State evidentiary law error in admitting uncharged act evidence is reviewed under the *Watson* standard. (*Winkler*, *supra*, 56 Cal.App.5th at p. 1164; *Hendrix*, *supra*, 214 Cal.App.4th at p. 248.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*); accord, *Watson, supra*, 46 Cal.2d at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, at p. 956.)

Defendants assert the jury's determination that Clark possessed a real gun was surely based on the impermissible propensity inference that, because Clark previously possessed a gun, he likely possessed a real gun in this case. The evidence, according to

Brown, was prejudicial because it portrayed defendants as dangerous criminals. Defendants maintain the trial evidence that Clark used a real gun was not strong in light of Moran's testimony as to the similarities in appearance between real and replica firearms. Defendants further assert that there is at least a reasonable probability that, had the evidence not been admitted, the jury would not have found, beyond a reasonable doubt, that the gun, which was never found, was a real firearm. And they assert that the prosecutor's closing argument exacerbated the prejudicial effect of the admission of this evidence. Clark asserts that the prosecutor's arguments to the jury were "paradigmatic propensity arguments."

The Attorney General responds that any error in the admission of the evidence was harmless under any standard. He maintains that the trial evidence relevant to whether the gun was real supported the jury's determination, and that defendants' arguments that the gun could have been a replica are speculative.

Regarding the gun, the victims testified that Clark pulled out a gun and demanded money, wallets, and phones. Clark racked the slide of the gun. O.F. testified that the gun looked real to him. J.R. and O.F. both testified Clark pointed the gun at them. O.F. testified that the gun was pointed at his stomach. G.N. testified that at one point, the gun was pressed against his left cheek. However, he did not remember whether it felt like metal.

Moran testified that, with a replica firearm, one is able to rack the slide just like a real firearm. He further testified that "[v]isually, unless it has that orange tip on it, there's really no way to tell" between a real and replica gun.

Through the uncharged act evidence, the jury learned Clark had been a passenger in a car in which a firearm was discovered. Moreover, the firearm was a large caliber weapon with an illegal magazine containing 15 rounds, in excess of the 10 rounds permissible under California law, as well as one round in the chamber.

As we have previously noted, "[f]or purposes of determining whether the error was harmless, we may consider whether the prejudicial effect is reduced by a prosecutor's closing argument." (*Hendrix, supra*, 214 Cal.App.4th at pp. 249-250.) "Conversely, we may consider whether a prosecutor's closing argument to the jury exacerbated the prejudicial effect. Any meaningful assessment of prejudice must proceed in the light of the entire record, including how the evidence was used." (*Id*. at p. 250.)

Here, after describing the trial testimony concerning the victims' perceptions about the gun, the prosecutor continued: "*Was there a real gun*? [¶] *Both defendants are felons*." (Italics added.) The italicized language strikes us as a propensity argument, and it exacerbated the prejudicial effect of the evidence. The prosecutor then asserted there would be no motive to discard a fake gun because "[y]ou don't get in trouble for a fake gun. Felons can possess fake guns. They can have Airsoft guns, they can have pellet guns." Thereafter, the prosecutor told the jury: "You cannot infer from this uncharged offense that defendant Clark has *a predisposition to commit crime* or anything like that. You don't just assume he's guilty because he committed a crime before. That is not, and I repeat, it is not how this works." (Italics added.) But that admonition warning the jury not to infer "predisposition to commit crime" or that defendants are guilty based on the prior gun possession did not tell the jury it should not infer predisposition to possess real firearms.[22] Moreover, in subsequently revisiting the

***

[22] For the same reason, we conclude that, under the circumstances here, the trial court's instructions to the jury did not negate the prejudice. As noted, the day before closing arguments, the trial court told the jury it did not want the jurors to infer "Gee, he committed a gun crime violation before; therefore, he must be guilty in this case. [¶] That's not how you're supposed to use that evidence. It's for other reasons, knowledge and other things. But don't conclude from that that he must be *guilty in this case* because he did it before." (Italics added.) Similarly, the standard part of CALCRIM No. 375, upon which the court instructed prior to closing arguments, told the jurors: "Do not conclude from this evidence that the defendant, Gerquan Clark, has a bad character or is *disposed to commit crime*." (Italics added.) While telling the jury not to conclude Clark

matter, the prosecutor highlighted the irrelevant and prejudicial nature of the gun Clark constructively possessed in 2016, noting for the jury: "It was loaded. . . . It was a real firearm. Okay. Real firearm. Loaded. An extended magazine which had about 15 live rounds in it. It was a .40 cal semiautomatic firearm and there was one in the chamber. It was a loaded real gun." Thus, she emphasized not merely the fact of the prior uncharged act, but the particular dangerousness and illegality of the firearm involved. These matters were not probative of any fact other than the premise that Clark, and, by extension, Brown, were dangerous people who carried dangerous guns. The prosecutor explained no other reason why the nature of the gun was something the jury should consider. Instead, she then went on to say: "The reason why . . . I wanted to present this evidence to you, is that *the defendant has had a gun before. He's gotten in trouble for a gun before.* You heard the judge just gave you notice that he's been in trouble for this, that he was convicted of this offense. [¶] And it's because of that, because of him being in trouble before and knowing that he can't have a real firearm, that's the motive in this case to get rid of the real firearm that they used in the commission of this robbery. [¶] It's all the motive in the world." (Italics added.) As we noted, our high court rejected a similar theory in *Alcala* and reaffirmed rejection of that theory in *Rogers*, where the court noted the prejudicial implications of allowing admission of evidence of past crimes for the sole purpose of showing the defendant feared punishment as a repeat offender. (*Rogers*, *supra*, 39 Cal.4th at p. 864, discussing *Alcala*, *supra*, 36 Cal.3d 604.) "[S]uch a policy would be unfair to repeat offenders because the highly prejudicial nature of prior-crimes evidence would make it difficult for such offenders to receive a fair trial, whereas the probative value of the evidence was slight." (*Rogers,* at p. 864*.)* Since our high court appears to have rejected such a theory of admissibility on undue prejudice grounds, we

---

must be guilty in this case or is disposed to commit crime, the admonition did not additionally tell the jury it should not conclude from the prior event that Clark was a person who was disposed to possess or carry firearms.

37

must also reject prosecutorial argument to the jury advancing a similar theory on the same grounds and conclude the argument adds to the prejudice in our harmless error analysis.

Considering the evidence supporting the existing judgment as to the felon in possession charge and firearm enhancements, we do not find it to be "relatively strong" and the evidence supporting a different outcome "so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, *supra*, 56 Cal.4th p. 956.) Instead, we conclude it is reasonably probable that, without proof of the prior uncharged act establishing Clark as someone who would have a real gun, and the prosecutor's related argument, the jury would have found the prosecution did not prove, beyond a reasonable doubt, that Clark possessed a real firearm so as to support the felon in possession of a firearm convictions and the firearm enhancements as to both Clark and Brown. (*Id*. at p. 955; *Watson, supra*, 46 Cal.2d at p. 836.)[23]

Accordingly, we shall vacate the convictions on count four, felon in possession of a firearm as to both defendants (§ 29800, subd. (a)(1)), and the true findings on the firearm enhancements as to Clark (§ 12022.53, subd. (b)) and Brown (§ 12022, subd.

_____

[23] We do not, however, conclude or imply that the evidence of the felon in possession offense or the enhancements was insufficient to support the convictions and findings. As this court has previously observed, firearms used in robberies are often never recovered and circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a real firearm. (*Monjaras*, *supra*, 164 Cal.App.4th at p. 1436.) "[W]hen as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt, as a matter of law, that the gun was a firearm." (*Id*. at p. 1437.)

(a)(1)), and remand the matter to afford the prosecution the opportunity to choose whether to seek a new trial on count four and the firearm enhancements.[24]

## II. Prosecutorial Misconduct

## A. Use of Prior Acts as Propensity Evidence

Following closing arguments, both defense attorneys moved for a mistrial based on the prosecutor's closing argument, asserting that the prosecutor argued propensity. Both defendants reprise that argument on appeal, and Brown separately asserts that other portions of the prosecutor's closing argument amounted to improper vouching for her own credibility and disparaging his trial counsel. In light of our conclusion as to the erroneously admitted section 1101(b) evidence and our reversal of the felon in possession of a firearm count and the firearm enhancements on that ground, we need not separately address defendants' contentions regarding prosecutorial misconduct related to the prosecutor's propensity arguments. However, because Brown's separate argument relates to all the counts, we shall address it next.

## B. Vouching for the Prosecution and Disparaging Defense Counsel[25]

### 1. Additional Background

Officer Reyes on cross-examination by Brown's attorney was shown the cell phone belonging to O.F. that was found by a married couple in the Burlington Coat Factory parking lot. Reyes acknowledged that the booking envelope with the cell phone

---

[24] Defendants in their prejudice analysis focus on the narrow issue of proof that the gun was real supporting the felon in possession of a firearm count and the firearm enhancements. They do not assert that the admission of evidence of Clark's prior uncharged act was prejudicial as to the robbery convictions. If they had, given the testimony of the victims and the recovery of their property from Clark, Brown's car, and nearby his car, we would conclude the error was harmless as to the robbery convictions under any standard.

[25] Clark did not join in these arguments on appeal.

had a red label indicating a request for fingerprints. Reyes testified they are trained to put a fingerprint label on evidence that needs to be printed. Also on cross-examination by Brown's attorney, Sergeant Young acknowledged that the evidence envelopes had red stickers on them that said "Print." He believed those stickers indicated a request for fingerprints, but testified he did not know if that had been done.

In his closing argument, Brown's attorney addressed the absence of fingerprint evidence: "Where's the fingerprints? *We know that they printed it.* Nothing was brought in. Couple of possibilities. One, if they had fingerprints that showed that these men were guilty, they would have shown it to you." He continued, "What is in evidence is that they have his fingerprints. What is in evidence is he has a prior felony. And what happens when you get a felony or any kind of arrest? They do the fingerprints. *What is in evidence is all the things that they did print*." (Italics added.) Although there was no evidence in the trial that any items had actually been processed for fingerprints, the prosecutor did not object to this argument.

Instead, the prosecutor in rebuttal argued: "[defense counsel] said that prints were done. There was no evidence of that. And *I'm not allowed to hide anything*. Okay. Not a thing. *I could lose my job and my law card*." (Italics added.) Brown's attorney objected on the grounds of vouching, and the trial court overruled the objection, stating in front of the jury: "Well, I don't think it's vouching. I think there was a suggestion that maybe the district attorney could have done something *which was not done*. So she's just explain[ed] what her role is, that's not vouching." (Italics added.) The prosecutor continued her argument to the jury: "The suggestion was that the D.A. hid something, which *I find incredibly offensive and that was an awful argument for [defense counsel] to make*." (Italics added.)

### 2. Brown's Contentions

Brown asserts that the prosecutor committed misconduct in vouching for the prosecution and disparaging defense counsel. Brown asserts that the prosecutor's

remarks, in response to defense counsel's fingerprint argument, that there was no evidence fingerprinting was done was false, and her further castigation of defense counsel's arguments as "awful" and "offensive" was disparaging. Brown further argues that the prosecutor vouched for her case when she stated she had nothing to hide and that she could lose her job and her law license by hiding evidence. And he asserts that the trial court endorsed the prosecutor's improper vouching by its oral ruling in front of the jury.

### 3. Analysis

#### a. Improper Vouching

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) *invokes his or her personal prestige* or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.] *Referring to facts not in evidence is 'clearly' misconduct* 'because such statements "tend[ ] to make the prosecutor [her] own witness— offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' [Citations.]" [Citations.] "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." ' [Citation.] We 'view the statements in the context of the argument as a whole.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*).)

The prosecutor's remarks— that she was "not allowed to hide anything," and that if she did so she "could lose [her] job and [her] law card"— is an argument relying on facts not in evidence. These comments also amount to improper vouching. For one, her

41

statement that she was not allowed to hide anything suggested that there was, in fact, no fingerprint results for the jury to consider. In addition, the prosecutor "invoke[d] . . . her personal prestige" in support of the argument by arguing she could lose her bar license if she hid something. (See *Rodriguez, supra*, 9 Cal.5th at p. 480.)

In *Rodriguez*, our high court determined the prosecutor's arguments that officers who testified "would not lie because each would not put his 'entire career on the line' or 'at risk' constitute[d] impermissible vouching." (*Rodriguez, supra*, 9 Cal.5th at p. 481.) Our high court explained: "The prosecutor's career-related arguments 'convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury.' [Citation.] The record here does not contain any direct or circumstantial evidence about whether the officers 'would put' their 'entire career on the line' or 'at risk' by giving false testimony. The officers did testify that they had served for 17 and 20 years, but the length of an officer's career does not supply evidence that the officer would risk the most severe career penalty (being fired) for testifying falsely. The prosecutor's arguments on these topics are thus based upon matters outside the record that were not subject to cross-examination." (*Ibid*.)

Our case is obviously different from *Rodriguez* in that the prosecutor was speaking not about law enforcement witnesses who testified, whether they would lie, and what consequences they would face. Instead, she was speaking of herself, that she was not allowed to hide anything, and that, if she did so, she could lose her license to practice law. In making that argument, the prosecutor was relying on matters not in evidence and was impermissibly vouching in doing so.[26] And the danger posed by such an argument

---

[26] We also note that the trial court's ruling in front of the jury could have had the effect of endorsing the prosecutor's statement. There was no reason for the trial court to say anything other than overruled at that point in time. And it could have stated the reason

that our high court discussed in *Rodriguez* is applicable here. The *Rodriguez* court reasoned: "When a prosecutor argues beyond the record about the career risks of untruthful testimony, the prosecutor invites the jury to fill in gaps in the evidentiary record by reference to the jury's own surmise based on the special reputation of law enforcement agencies and officers for veracity, as well as suppositions about the special insight prosecutors may have into law enforcement disciplinary procedures. The prosecutor thus 'invite[s] the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence.' " (*Rodriguez, supra*, 9 Cal.5th at pp. 482-483.) The same can be said when a prosecutor argues her own career-related risks of misconduct: she invites the jury to rely upon her prestige as a prosecutor and the prestige of her office.

We conclude the prosecutor engaged in improper vouching.

### b. Disparaging of Defense Counsel

" ' "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." [Citations.] "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1336-1337 (*Seumanu*).) "When a prosecutor denigrates defense counsel, it directs the jury's attention away from the evidence and is therefore improper. [Citation.] In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of

---

for its ruling later, outside the presence of the jury. Instead, the court's comment that the defense had suggested the prosecutor did something "that was not done" could have left the jury with the impression that the prosecutor had not hidden evidence when there was no evidence on the point one way or another.

defense counsel, and inquire whether the former constitutes a fair response to the latter." (*People v. Frye* (1998) 18 Cal.4th 894, 978.)

There was evidence that several items of evidence collected by law enforcement were placed in booking envelopes which bore stickers requesting fingerprinting. Defense counsel argued to the jury that "we know that they printed" and "[w]hat is in evidence is all the things that they did print." There was no evidence introduced to establish that fingerprinting had actually been done. The prosecutor's remedy to this improper argument was to object on grounds that defense counsel was arguing facts not in evidence.

Instead, responding to defense counsel's argument, the prosecutor stated there "was no evidence" that "prints were done," a perfectly appropriate argument. But then she said: "And I'm not allowed to hide anything. Okay. Not a thing. I could lose my job and my law card." She then stated that defense counsel's argument was "incredibly offensive and . . . an awful argument for [defense counsel] to make." Again, the prosecutor's remedy was to object to defense counsel's improper argument, not to disparage counsel. We are reminded here of the old adage, "two wrongs don't make a right."

Consequently, we conclude that these latter comments about defense counsel were not "fair response" to defense counsel's remarks. (See *Seumanu, supra*, 61 Cal.4th at p. 1337.) The prosecutor would have done well to simply remind the jurors there was no evidence the items were printed and that they were duty bound to decide the case based only on the evidence and testimony they heard.

### 4. Prejudice

"Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. [Citation.] Error with respect to prosecutorial misconduct is evaluated under" *Chapman, supra*, 386 U.S. 18, "to the extent federal constitutional rights are implicated," and under *Watson, supra*, 46

44

Cal.2d 818 "if only state law issues were involved. [Citation.] *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. [Citations.] *Watson* applies where the prosecutor uses ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)

Brown asserts that, because prosecutorial misconduct violated his constitutional rights, *Chapman* applies, he sustained prejudice under that standard, and all of his convictions must be reversed. Brown asserts that he was prejudiced by the prosecutor's misconduct because the evidence of his presence at the robberies was circumstantial. He asserts that the evidence of his presence at the robberies—items taken were found in his car—was equally consistent with the theory that he merely gave Clark a ride to Burlington Coat Factory. The Attorney General responds that any prosecutorial misconduct was harmless under any standard.

At trial, J.R. and O.F. both identified Clark as the man who pulled out the gun during the robbery. J.R. affirmatively identified Brown as the other man. The men took various items from the victims and then left.

O.F.'s wife tracked O.F.'s phone to Burlington Coat Factory. At that location, less than 90 minutes after the robbery, police set up to watch what turned out to be Brown's green Acura.

As law enforcement observed the scene, Brown approached his car from the store. When Brown saw a police officer, he turned around and walked away. This behavior evinced a consciousness of guilt. After Brown was detained, he was sweating profusely, "[k]ind of frantic," and very nervous – additional evidence from which consciousness of guilt could be inferred.

Shortly thereafter, Brown's cousin, Clark, came out of the store, and, by this time, there were police officers throughout the parking lot. Clark went back into the store but

he too was detained. Clark was found to be in possession of some currency and J.R.'s cell phone.

On the store's surveillance video, Brown could be seen entering the store first wearing a red shirt. Approximately 10 seconds later, Clark came in, bare-chested, putting on a white T-shirt. Based on Clark putting on a shirt, it could reasonably be inferred that he, and Brown, had changed clothes.

In Brown's Acura, police found G.N.'s identification card and lanyard. G.N. testified that his lanyard as well as the cell phone he had was taken by the person who did not have the gun. G.N.'s and O.F.'s cell phones were both found on the ground near Brown's car.

At a showup, J.R. identified both Clark and Brown. O.F. recognized Clark as the man who had been holding the gun. Clark and Brown are cousins. Under the circumstances, we conclude these identifications were credible notwithstanding Loftus's eyewitness identification testimony.

Brown argues that the circumstantial evidence was equally consistent with the theory that he merely gave Clark a ride to Burlington Coat Factory. To that, we note two things. First, while the evidence establishes Brown gave Clark a ride to the store, J.R.'s identification of Brown shortly after the robbery and the presence of an item of stolen property in Brown's car taken by the perpetrator who did not have a gun proves Brown did more than furnish Clark a ride to do some shopping. Second, there is no evidence establishing that Brown picked up Clark somewhere and "merely" gave Clark a ride to the store.

Based on the admissible evidence, we conclude that the prosecutor's misconduct was harmless as to the robbery convictions under any standard. Under *Chapman*, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3

46

(*Aledamat*).)  To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and … reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)  Based on this evidence, there is no reasonable possibility that the prosecutor's remarks—that she was not allowed to hide anything, that she could lose her job and her law card if she did, and that Brown's attorney's arguments were "incredibly offensive" and "awful" from her perspective—contributed to the verdict as to the robbery convictions.

According to Brown, the fingerprinting evidence was "crucial" because it "highlighted the lack of direct evidence that [Brown] was at the scene of the robbery." One item that was in a booking envelope with a label indicating a request for fingerprints was O.F.'s cell phone.  Another was G.N.'s cell phone.  Another item was G.N.'s California identification card.  That there was no evidence connecting these items to Brown through fingerprints is essentially inconsequential given the other admissible evidence connecting him to the robberies.

We conclude that it is not reasonably possible that the prosecutor's remarks contributed to the verdict.  (*Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367.)  The prosecutor's remarks were harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at p. 24; *Aledamat, supra*, 8 Cal.5th at p. 3.)

### III.  Brown's Cumulative Error Claim

Brown asserts that the cumulative effect of the errors discussed in parts I. and II. of the Discussion, *ante*, require reversal.

The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.)  "In examining a claim of cumulative error, the critical

47

question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; accord, *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 (*Rivas*).)

Taking all of Brown's contentions into account, we are satisfied that he received a fair trial as to the robbery counts. Given the direct and circumstantial evidence supporting his convictions on those counts, we conclude Brown suffered no prejudice as to the robberies. He was " 'entitled to a fair trial but not a perfect one.' " (*Rivas, supra*, 214 Cal.App.4th at p. 1437, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

## IV. Brown's Prior Prison Term Enhancement

Brown asserts, and the Attorney General concedes, that the matter should be remanded so the trial court may strike his section 667.5, subdivision (b), one-year prior prison term enhancement, which did not involve a sexually violent offense, given the statutory amendment brought about by S.B. 136. We agree defendant is entitled to the ameliorative benefit of S.B. 136 since that law became effective while his appeal was pending. (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 761, 772; *People v. Winn* (2020) 44 Cal.App.5th 859, 872-873; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) And because the trial court did not impose the maximum sentence on the base term on one of the robbery counts and dismissed a prior serious felony conviction enhancement under section 667, subdivision (a), we agree remand for resentencing is appropriate. (See *Gastelum*, at p. 772, citing *People v. Buycks* (2018) 5 Cal.5th 857, 893 [when error affects part of a sentence we must remand for a full resentencing on all counts and allegations].)

## DISPOSITION

Defendants' convictions on count four are reversed and the sentences previously imposed thereon and stayed pursuant to section 654 are vacated. The true findings on the section 12022.53, subdivision (b), firearm enhancement allegations asserted against Clark are struck and the sentences imposed thereon vacated. The true findings on the section

12022, subdivision (a)(1), firearm enhancement allegations asserted against Brown are struck and the sentences imposed thereon vacated. Brown's section 667.5, subdivision (b), prior prison term enhancement is struck, and his case is remanded for resentencing. As to both defendants, the matter is remanded to the trial court for a new trial on count four and the firearm enhancement allegations attached to counts one through three, or for resentencing should the People decide not to retry count four and the firearm enhancement allegations. Thereafter, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

_____/s/_____
MURRAY, J.

We concur:


___/s/_____
BLEASE, Acting P. J.


___/s/_____
HOCH, J.